Argued and submitted September 9, 2005, reversed January 18, 2006

In the Matter of
Nicholas Ryan Squiers and Garrett James Squiers,
Minor Children.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

Jacqueline Annette SQUIERS,
aka Jacqueline Annette Boley,
*Appellant.*

99-520J, 99-521J; A127744

126 P3d 758

Inge D. Wells argued the cause for appellant. With her on the brief was Wells & Wells.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

ROSENBLUM, J.

## ROSENBLUM, J.

Mother appeals from a judgment terminating her parental rights to two of her children, N and G,[1] on the grounds that she is unfit and that she neglected the children. ORS 419B.504; ORS 419B.506. On *de novo* review, ORS 419A.200(6)(b), we reverse.

We take the facts from the trial court file and the evidence presented at the termination hearing. N and G, who were eight and six years old, respectively, at the time of the termination hearing, have twice been removed from mother's home and placed in foster care. The first removal was in 1999, and the events leading up to it were as follows. Mother separated from the children's father in 1997, when she was pregnant with their youngest child, G. The father moved out and began living with a neighbor. The following year, the father was convicted of assaulting that woman's children. As a condition of his probation, the father was ordered not to have contact with anyone under the age of 18. In 1999, the Department of Human Services (DHS) received a report that the father had been having contact with N and G in mother's home. A DHS worker went to mother's home to investigate, and found the father and another man caring for the children. The worker did not remove the children from the home, but warned mother not to allow the father to have contact with the children.

A few months later, DHS received another report that the father was having contact with N and G in mother's home. A different DHS worker went to mother's home and, as had the first worker, found the father and another man caring for the children. The worker noted that the home was a mess. The worker removed the children from the home. In the process of doing so, he was unable to find clean diapers or clean clothes.

After the children were removed, mother and DHS agreed that mother would undergo a psychological evaluation. Accordingly, in January 2000, mother was evaluated by

---

[1] Mother and the father have two other children who live with their grandparents and who are not subjects of this proceeding.

Dr. Basham. The evaluation revealed that mother had the basic intellectual ability to understand her children's needs and to use good judgment as a parent. It also revealed that mother had a "considerable potential for denial," was under-assertive, and showed signs of defensiveness and codependency.

Basham recommended that mother complete a series of parenting classes to improve her awareness of the children's needs and to teach her effective parenting strategies. He also recommended that, if problems were to arise during mother's supervised visits with the children, she should participate in either a "hands on" parenting program or a more individualized one that could directly address her interactions with the children. In addition, Basham recommended that mother participate in mental health therapy to work on her low self-esteem and under-assertiveness and to "look particularly close[ly] at the possibility of depression and post traumatic stress disorder." He also thought that domestic violence counseling might be appropriate if it came to light that mother had been abused. In Basham's opinion, mother's ability to follow through on his recommendations and on her own expressed intention of ending her relationship with the father would be the best indicators of whether the children could safely be returned to mother in the near future.

Mother did follow through with Basham's recommendations. In February 2000, she divorced the father and obtained a restraining order against him. She participated in weekly counseling and made a lot of progress in understanding "who is safe and who isn't." She cleaned her home, and DHS determined that it was ready for the children. She kept her appointments with DHS, and her visits with the children were appropriate. She also enrolled in parenting classes at the Relief Nursery, a state-sponsored program offering various family services. The first class was an "interactive play lab"—the type of "hands on" training that Basham had recommended. After the first month of classes, in June 2000, DHS returned the children to mother's care, although they remained under the jurisdiction of the juvenile court.

After the children were returned to her, mother continued to participate in parenting classes at the Relief

Nursery, completing six of the seven classes in the "interactive play lab" setting, and attending three more parenting classes in the summer of 2000, and six classes offered in the fall. Mother initially made progress in her parenting skills: she was open to feedback and was applying it correctly. However, her progress slowed over time. She became more resistant to feedback, insisting that she was already doing the things that the interventionist who worked with her recommended. The parent educator at the Relief Nursery felt that mother's progress was hampered because she was overwhelmed. According to the educator, the children had a lot of special needs and it was difficult for mother to meet those needs regularly. For example, the children were delayed in their language skills and physical development, which required mother to be "very in tune with their cues, with their language, [and] with their interaction with other peers." Mother was inconsistent in her attention to the children; she was often distracted by other families and adults in the room and needed to be redirected to pick up on the children's cues. She also missed safety issues, although she responded appropriately when they were brought to her attention. Mother made little progress "independently practicing goals" and needed constant reminders. She was able to set limits with the children but was unable to follow through with them. The parent educator felt that mother's biggest problem was that, although she expressed an understanding of the children's needs, her interactions with the children "demonstrated a very clear misunderstanding of what their needs were."

Despite those concerns, the staff at the Relief Nursery felt that mother was capable of meeting the children's needs. In December 2000, they performed a "Family Assessment." Mother's scores on the assessment ranged from "generally adequate" to "problems of a moderate nature." The assessment revealed no problems that would justify again removing the children from their home. In March 2001, the dependency petitions were dismissed on DHS's recommendation.

Although not required to do so, mother continued to take advantage of services at the Relief Nursery after the

petitions were dismissed. She enrolled the children in a preschool class designed for at-risk children and signed up for home visits to help with her own parenting skills. The children's preschool teacher made home visits once a month from November 2001 until the fall of 2002. She continued to work with mother sporadically after that time. At the hearing, the teacher gave a detailed explanation of mother's difficulties with parenting. According to her, mother had trouble establishing routines, setting limits and boundaries, following through with things like diapering and toilet training, keeping her home clean, supervising the children, and feeding them properly. Even with the parent training, mother continued to struggle with those issues.

DHS removed the children from mother's home again in the fall of 2002 after receiving another report that mother was allowing the father to have contact with the children. The agency had not received any report that the father had abused N or G; rather, its concern that he posed a danger to the children was based on his abuse of the neighbor's children. In DHS's view, mother should not have allowed the father to have contact with N and G and, in doing so, she demonstrated that she was unable to protect them from him. Mother testified that she allowed the contact because the father's probation period had ended and she understood that he was entitled to visitation under the terms of their dissolution judgment. She claimed that she had checked with DHS and was told that there were no longer restrictions. However, DHS had no documentation of any such communication and did not acknowledge that it had occurred.

After the children were removed the second time, mother entered into a series of service agreements with DHS. The first called for mother to engage in counseling, inquire about "mentoring services," attend supervised visitation with the children, meet with her landlord to discuss the possibility of keeping her housing, and clean her home to acceptable standards. A follow up "action plan" called for her to make a decision about whether to keep her restraining order in place and enforce it, and to see a psychiatrist about medication for her depression. A second service agreement called for mother to undergo a second psychological evaluation with Basham,

to participate in individual counseling, to continue services at the Relief Nursery, and to attend vocational rehabilitation.

Mother appears to have complied with each of the service agreements. In January 2003, she underwent a second psychological evaluation with Basham. The evaluation revealed that mother continued to show signs of denial, and Basham expressed concern that mother's issues with denial left her vulnerable to the father and to other potential partners who might take advantage of her "reluctance to view others critically." He also expressed doubt about whether mother would be able to protect the children from any partners who posed a risk to them. Excluding the issue of protecting the children from their father or other dangerous partners, Basham found "only mild impairment in her functioning." He explained that mother "tends to be stress-reactive, and is prone to have bouts of depression or anxiety when her stress level increases[.]" He also noted, for the first time, that mother has borderline personality traits. Nevertheless, he opined that mother "does not show signs of mental illness or serious personality problems which would leave her wholly unable to function as a parent." He also opined that mother may have problems if either of the boys were to develop "serious psychological" or "major behavioral" problems, but concluded that, "[i]n other regards, I do believe that [mother] is capable of caring for the children." Basham recommended continued individual counseling and parenting classes.

Mother followed through with Basham's recommendations and complied with the remaining provisions of her service agreements with DHS. She ceased having contact with the father, continued with individual counseling, and participated in domestic violence counseling. In April 2003, a Citizen Review Board assigned to evaluate mother's case found that she had completed 90 percent of her parent training at the Relief Nursery, would soon complete domestic violence training, had been participating in counseling, had seen a psychiatrist, and was on medication. It also noted that she was in school and visited the children weekly. The board recommended extending mother's visits with the children and anticipated that they would be returned to mother in October.

Despite the board's conclusions, in the summer of 2003, DHS decided to move toward terminating mother's parental rights. Accordingly, it changed the children's permanency plan from reunification with mother to adoption.

Around December 2003, a court-appointed special advocate recommended that mother's rights not be terminated. The special advocate noted that mother was living in stable housing in Eugene, was working part time, was attending community college to become a mechanical engineer, was in therapy, and had severed all ties with the father. The special advocate had observed three visits between mother and the children and did not see "anything but positive interaction with the boys." She concluded that, "[g]iven the commitment [mother] has made to making positive change, I do not believe that termination of parental rights is warranted."

In January 2004, DHS filed a petition to terminate mother's rights. The record does not reveal the precise reason for DHS's decision to seek termination against the recommendations of the Citizen Review Board and the special advocate, except that a DHS caseworker had concluded that mother "had not made sufficient progress." The record also reveals that the children were "blossoming" in foster care and that their foster mother expressed a desire to adopt them.

During the year following DHS's decision, mother continued to have supervised visits with the children. Mother was almost always on time for the visits and often brought food and toys with her. Although there were no issues with mother missing visits, two workers were concerned about mother's interactions with the children. Specifically, they expressed concern that mother was engaging in "sexualized behavior" toward the children. One worker thought that she was "overly affectionate," kissing them on or near the mouth, picking them up and placing them on her lap with her legs spread, and bringing her body in close proximity to theirs. Another observed that mother wore low-cut blouses and would lean forward and put the children at eye level with her chest. That worker also thought that mother hugged the children in a manner that was "more intense" than it should

have been. The workers also thought that mother inappropriately asked the children whether they needed to use the bathroom instead of waiting for them to tell her when they needed to do so. Because of those concerns, DHS drew up visitation guidelines that instructed mother not to engage in those behaviors. Mother signed the guidelines and, for the most part, was able to modify her behavior to address those concerns.

In the one and one-half years between DHS's decision and the termination hearing, mother continued to attend parenting classes at the Relief Nursery, to participate in weekly counseling, and to follow through with the recommendations of her therapist. In the spring of 2004, mother underwent a third psychological evaluation with Basham. In his opinion, mother had made some gains in her parenting skills as a result of her counseling and parenting classes, but had little intuitive understanding of the boys' needs. She could provide only "sketchy" information about their needs, and her behavior—for example, being overly affectionate with the boys and then becoming angry with DHS for setting limits on her behavior—demonstrated how her own needs could overwhelm her awareness of the needs of her children. He conceded that she had made some recent gains, but had done so only with the aid of extensive ongoing therapy and the anxiety of an upcoming termination hearing. He cautioned that, "[w]hen these factors are no longer present, and she has the additional demands of full-time parenting, there is likely to be a return of her primary focus on her own needs, to the point of overlooking what is best for her sons." He also opined that, if the boys were returned to her, there would be "some" decline in her functioning and "perhaps" an increase in depression and a "greater sense of loneliness."

Basham stressed that, because mother was likely to put her own needs before those of her children, there was a danger that she would expose them to a dangerous partner. He explained:

> "The current diagnoses do not suggest very much risk for [mother] as a parent, but the borderline personality traits are the best psychological explanation for her decision to allow the boys to have contact with their father in the past,

and these traits continue to exist for her. They leave her at risk for failing to stay attentive to the boys' needs in the future, if and when she pursues a new relationship. She would then need to make a decision about the effect of her partner on her sons, balancing her own needs and wants against those of the children. She does not have the psychological ability to provide adequate protection of the children against a dangerous partner, and so her social judgments and decision making about a partner becomes quite important in the boys' future safety. Personality traits do not change easily, and this risk continues for [mother] in spite of some gains that she has shown over the past year."

He cautioned that mother continued to lack insight into her susceptibility to manipulation by a partner and concluded that her "lack of insight derives from longstanding personality issues, which, combined with the severity of her sons' special needs, will pose a barrier to meeting her sons' special needs in the future."

As a result of Basham's evaluation, mother's therapist decided that it was not in mother's "best interest" to continue with individual counseling. The therapist agreed with Basham that mother had made some progress in recognizing that the father posed a danger to the children.[2] However, after nearly a year of therapy, mother was still unable to articulate how she could protect her children from a dangerous partner. According to the therapist, mother could say only that, if a court were to tell her that the father was safe and should have visitation, then mother would trust the court's decision.

Mother's therapy sessions focused primarily on her issues with the father. Mother did not discuss her issues regarding the children's dietary needs or the state of her home, other than to comment that she had difficulty keeping it organized when there was a lot going on. She did, however, discuss some of the children's special needs. For example, mother described the children's diagnoses and explained that the children were making progress, although she could not

---

[2] Part of mother's breakthrough in that respect was discovering that, after the children were removed the second time and after she had ceased having contact with the father, he had moved into the house where the couple's two oldest children, both girls, were living and had sexually abused one of them.

articulate what that progress entailed. Additionally, as a result of her therapy, mother gained a better understanding of what level of supervision was appropriate for the children.

Despite some progress, mother's therapist felt that their sessions could not provide mother any additional help in enabling her to regain custody of her children. The therapist recommended dialectical behavioral therapy (DBT) to help mother cope with her borderline personality traits, specifically, to assist her in communicating, regulating her emotions, and developing coping skills for stressful situations. Mother followed through on that recommendation and completed the DBT training course.

In January 2005, the trial court terminated mother's parental rights. At the termination hearing, DHS adduced evidence from child psychologists about the boys' special needs and their likely prognoses if those needs were not met. Dr. Cordova testified that N has an IQ of 84, possibly attention deficit hyperactivity disorder (ADHD), and a communication disorder not otherwise specified—that is, a significant impairment in his ability to understand and formulate language. He described N as being "quite delayed" in adaptive behaviors—for example, self-care and behaving in the community. He could not tell with any certainty the cause of N's delays. He thought that N was also at risk for learning problems, for delays in his social skills, and for social rejection by his peers. Those risks could lead to emotional difficulties, depression, and low self-esteem, which, in turn, could lead to delinquency and substance abuse.

In Cordova's opinion, N needed exposure to stimulating intellectual opportunities, including conversations with his caregiver, educational books, educational TV, and life skills training—that is, "things that would help him be more able to be at an age-appropriate level for self-care activities, acting in a community safely, helping around the house." He also needed a caregiver who would be a strong advocate in the school system and who would check in with the teacher about N's progress and point out areas in which he needed more support. Cordova expressed concern that, if N were to return to mother and then be taken away again, he would have increased behavior problems and long-term

issues relating to trust. In addition, Cordova opined that, if N were placed in an environment where he was exposed to "risky people," he would feel frightened and anxious and may "act out" or wet the bed more often. Also, Cordova was concerned that, if N did not receive the attention and stimulation that he needs, he would regress or fail to make progress developmentally. Cordova did not speak with mother during the course of his evaluation and did not comment on her ability to meet N's needs.

Dr. Verlinden testified about G's special needs. She stated that G had an IQ of 77 and a possible ADHD diagnosis. He also had self-care issues and needed help learning to bathe, dress himself, and brush his own teeth. She could not offer an opinion about the cause of G's problems. In her opinion, G would be able to live independently as an adult if he were provided with conscientious help and instruction in life skills throughout his childhood and adolescence. If he did not get that help, he would be at high risk for dropping out of school, not being able to maintain employment, and becoming homeless. In her opinion, if he were returned to mother and then removed again, he would be at risk for developing attachment problems—that is, having trouble trusting adults and being able to form meaningful relationships later in life. Like Cordova, Verlinden did not testify as to mother's ability to meet G's needs.

Basham also testified at the termination hearing and expanded on his earlier evaluations of mother. For example, he explained the significance of his diagnosis of mother as having "borderline personality traits." He stated that mother's condition was "less serious" and "more likely to respond to treatment or life circumstances than a genuine personality disorder." He also stated that, although he had diagnosed mother with a "major depressive disorder," it was in full remission the last time he had evaluated her. Indeed, he stated that, at the time of the last evaluation, mother was in "one of the most stable periods of her life." He also noted that the denial that she had demonstrated during her first evaluation had improved by the time of her last evaluation. Yet he also opined that mother was unable to parent her sons, both because she was unable to meet their special needs and because she could not adequately protect them from a

dangerous partner. He did not specify the ways in which mother would be unable to meet her children's needs. He stated only that mother tended to be stress-reactive and that, if two high needs children were reintroduced into her household, "it's likely there will be a psychological decline for her, and an increase in specific symptoms."

Mother also testified at the termination hearing. She stated that she had not had any contact with the father in more than two years, that his parental rights had been terminated, and that, if he reappeared, she would call the police. She testified that the father "has absolutely no right to be in the boys' lives or [mother's] life." She also stated that her home was clean and organized, that it was inspected periodically as part of a low-income housing program that she was part of, and that, if the home were not in an appropriate condition, she would not be allowed to live there. She testified about all of the classes that she had taken and how those classes had helped her to become a better parent. For example, she described the DBT class and how it helped her make better choices and cope with her borderline personality traits:

> "What it was was learning to make good choices. To help get the skills to counter out the borderline personality traits. One thing that they—that Lucy reflected on a lot is making 'wise mind' choices. Not over-emotionalizing. Not doing a lot of rationalizing and reasoning, but—she showed us how to step out of the picture and look at it from a different point of view. And that—and how to recognize our point of stressors, and how to defuse those to make good choices."

She also explained how she would meet the boys' special needs. She testified that she would work closely with everyone who works with them, including their teachers, speech therapists and others, and she would cooperate with them and implement their suggestions. She would also work to read the boys' mannerisms and facial expressions so that she could be alerted to any problems and be able to address them. In addition, in order to help them communicate better and learn about the world around them, she would offer the boys a lot of choices—even for small things like what shirt to wear. She would also teach them the consequences of their choices—how the choices affect them and those around them. She was also aware that, in order to learn, the boys needed a

lot of repetition. She was confident that, if the boys were returned to her, she could meet their needs.

After considering the evidence, the trial court terminated mother's parental rights. Mother appeals, arguing that the evidence was insufficient to support termination.

We begin with an overview of the termination statutes. The statutory grounds for terminating parental rights include the following: (1) the parent is unfit by reason of a single or recurrent incident of extreme conduct towards any child, ORS 419B.502; (2) the parent is unfit by reason of conduct or a condition seriously detrimental to the child and integration of the child into the parent's home is improbable within a reasonable time due to conduct or a condition not likely to change, ORS 419B.504; (3) the parent neglected the child, ORS 419B.506; and (4) the parent abandoned the child, ORS 419B.508. The trial court terminated mother's rights based on the second and third grounds.[3]

■ We first address whether the trial court properly terminated mother's rights on the ground of neglect under ORS 419B.506. The trial court found that mother had neglected her children within the meaning of ORS 419B.506 because of her "failure to implement a plan designed to lead to the integration of the children into [ ] mother's home." Mother asserts that the trial court's finding was essentially a finding that mother had failed to make adequate efforts to cure all of the conditions and circumstances that led to the state's intervention and that such a finding is insufficient to constitute neglect within the meaning of ORS 419B.506. She argues that, although a failure to visit, support, or maintain other

---

[3] Specifically, the court concluded that the following "conditions" justified termination: (1) a lack of effort or failure to obtain and maintain a suitable or stable living situation for the children so that return of the children to mother is possible; (2) a failure to present a viable plan for the return of the children to the mother's care and custody; (3) a failure to learn or assume parenting skills sufficient to provide for the safe and proper raising of the children; (4) an emotional illness, mental illness, or mental deficiency of such nature and duration as to render mother incapable of providing care for extended periods of time; (5) physical and emotional neglect of the children; (6) a lack of effort to adjust mother's circumstances, conduct or condition to make the return of the children to mother possible, or failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

contact with the children in violation of the terms of a reintegration plan may constitute neglect, factors unrelated to her contacts with the children cannot. We agree.

■ ORS 419B.506 defines neglect and gives three examples of it. It provides:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child or ward for six months prior to the filing of a petition. In determining such failure or neglect, the court shall disregard any incidental or minimal expressions of concern or support and shall consider but is not limited to one or more of the following:

"(1)   Failure to provide care or pay a reasonable portion of substitute physical care and maintenance if custody is lodged with others.

"(2)   Failure to maintain regular visitation or other contact with the child or ward that was designed and implemented in a plan to reunite the child or ward with the parent.

"(3)   Failure to contact or communicate with the child or ward or with the custodian of the child or ward. In making this determination, the court may disregard incidental visitations, communications or contributions."

Although the examples of neglect found in the statute are not intended to be an exhaustive list, they are illustrative of the type of factors that may be relied on in determining whether a parent "neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child." Under the maxim *ejusdem generis*, any factor relied on by a court in making a finding of neglect must be the same kind of factor as those listed in the examples. *See Bellikka v. Green*, 306 Or 630, 636, 762 P2d 997 (1988) ("[W]hen the legislature chooses to state both a general standard and a list of specifics, the specifics do more than place their particular subjects beyond the dispute; they also refer the scope of the general standard to matters of the same kind, often phrased in Latin as '*ejusdem generis.*' ").

■  The three examples of neglect in the statute focus on the parent's contacts with the child. Subsection (1) focuses on the parent's financial contacts with the child and subsections (2) and (3) focus on the parent's personal contacts, including visitation and other communications, with the child. Under the maxim *ejusdem generis*, we conclude that a finding of neglect under ORS 419B.506 must be based on the same type of factors—that is, a parent's failure to maintain contact, either financial or personal, with his or her children. A court may not use the statute as a catch-all provision to justify termination based on factors unrelated to the parent's contacts with the children.

The state remonstrates that, although the examples in the statute focus on a parent's contacts with the children, this court has previously held that *any* failure to follow an existing reunification plan may constitute statutory neglect sufficient to justify termination.[4] In support of that argument, it relies on *State ex rel Juv. Dept. v. Boren*, 105 Or App 599, 609-10, 806 P2d 149 (1991), and *State ex rel Juv. Dept. v. Kirk*, 44 Or App 381, 606 P2d 634, *rev den*, 289 Or 45 (1980). We view those cases differently. In both of those cases, we found that termination was justified because of the parent's failure to abide by the terms of a reunification plan relating to visitation and financial support of the children. ORS 419B.506(2) explains that a reintegration plan is relevant to a finding of neglect in that the "[f]ailure to maintain regular visitation or other contact with the child" in accordance with such a plan constitutes neglect. We did not hold that a court may rely on factors unrelated to a parent's financial or personal contacts with his or her children in making a finding of neglect under ORS 419B.506, and we decline to do so now.

It is undisputed in this case that mother maintained regular visitation with the children. There is also no allegation that mother failed to pay a reasonable portion of the children's substitute physical care and maintenance or that

---

[4] It is not clear from the state's argument what provision of the reunification plan mother is alleged to have violated, but it is clear that mother is not alleged to have violated any provision providing for visitation, financial support, or other contact with the children.

mother otherwise failed to maintain contact with the children. Termination was therefore inappropriate under ORS 419B.506.

■■    We next address whether the court properly terminated mother's rights under ORS 419B.504 due to conduct or a condition seriously detrimental to the children. The Supreme Court has explained the proper analysis for a court to engage in to determine whether to terminate a parent's rights under ORS 419B.504:

> "ORS 419B.504 sets out a two-part test for determining whether to terminate parental rights, both parts of which must be met before the court orders termination. First, the court must address a parent's fitness: The court must find that the parent is 'unfit by reason of a conduct or condition seriously detrimental to the child.' That, in turn, requires a two-part inquiry: The court must find that: (1) the parent has engaged in some conduct or is characterized by some condition; and (2) the conduct or condition is 'seriously detrimental' to the child. Second—and only if the parent has met the foregoing criteria—the court also must find that 'integration of the child into the home of the parent or parents is improbable within a reasonable period of time due to conduct or conditions not likely to change.' "

*State ex rel SOSCF v. Stillman*, 333 Or 135, 145, 36 P3d 490 (2001). The conduct or conditions seriously detrimental to the child must have rendered the parent unfit at the time of the termination hearing. *Id.* at 148. In addition, the facts on which termination is based must be established by clear and convincing evidence. ORS 419B.521.

Under the first step of our inquiry, we determine whether the state has proved by clear and convincing evidence that mother has "engaged in some conduct or is characterized by some condition." We conclude that the relevant condition by which mother is characterized is her borderline personality traits as diagnosed by Basham.

■    The second step of our inquiry is more challenging: We must determine whether that condition is "seriously detrimental" to the children. The Supreme Court has explained that "seriously detrimental" means more than the inability "to furnish surroundings which would enable the child to

grow up as we would desire all children to do." *State v. McMaster*, 259 Or 291, 303, 486 P2d 567 (1971). Instead, "[t]he legislature had in mind conduct substantially departing from the norm * * *." *Id.* at 304. The state asserts that mother's borderline personality traits satisfy that standard for essentially three reasons: (1) They render her unable to protect her children from dangerous partners, (2) they impede her ability to recognize and address the children's special needs, and (3) they make her stress-reactive so that she is easily overwhelmed and cannot maintain her house in a suitable living condition. We address each argument in turn.

Instructive on the first point is our line of cases involving parents whose rights were terminated because of their inability to protect their children from an abusive partner. In *State ex rel SCF v. Ettinger*, 143 Or App 418, 424, 923 P2d 1290, *rev den*, 324 Or 395 (1996), the mother was diagnosed as having a personality disorder with both "anti-social and dependent characteristics," that caused her to engage in a series of abusive relationships. At least one of her abusive partners had physically abused her children. *Id.* at 421. At the time of the termination hearing, she was living with an alcoholic who was drinking and who had physically assaulted her. It was into that home that she planned to move her children. *Id.* at 424. We concluded that the mother's personality disorder was seriously detrimental to her child.

Similarly, in *State ex rel Juv. Dept. v. Geist*, 97 Or App 10, 14, 775 P2d 843 (1989), *aff'd*, 310 Or 176, 796 P2d 1193 (1990), the mother was diagnosed with an antisocial personality that caused her to interact with her children with anger, hostility, and dependency. In addition, she had failed to protect her children from their abusive father. Particularly troubling was that, despite the mother's knowledge that the father was abusing their children, the mother left the children in the father's care when she went to work and, even after she separated from him, continued to leave them with the father. At the time of the termination hearing, the mother had a new boyfriend, who she admitted had been violent toward her. The mother had also refused counseling to

address her problems with domestic violence. *Id.* We concluded that the mother's condition justified termination. *Id.* at 15.

Finally, in *State ex rel Juv. Dept. v. Gohranson*, 143 Or App 36, 44, 923 P2d 1259, *rev den*, 324 Or 395 (1996), three of the children had been physically and sexually abused while in the mother's care. The mother consistently denied that the father could have been the abuser and, instead, blamed her older children, including her six-year-old daughter, for the sexual abuse. *Id.* at 46. Although the mother had, at the time of the termination hearing, separated from the father, we observed that the mother's actions belied her intent to remain separated from him. We noted, for example, that the mother had opted to move to California, which put her closer to the father. *Id.* at 51. We also noted that, even if she did remain separated from the father, the mother had shown a pattern of dependent relationships and there was a strong possibility that she would again involve herself in an abusive relationship. *Id.* at 52. We concluded that there was clear and convincing evidence that the mother would not be able to protect her children in the future and that termination was therefore appropriate. *Id.*

This case stands in stark contrast to *Ettinger*, *Geist*, and *Gohranson*. Unlike each of those cases, there is no evidence that N or G has ever been abused. In addition, although mother initially showed signs of denial that the father posed a danger to the children, mother testified at the termination hearing that she had come to realize that the father had indeed abused other children and was dangerous. She expressed her resolve to keep the father away from the children in the future. Mother's actions demonstrate the strength of that resolve. At the time of the termination hearing, mother had divorced the father and had had no contact with him in two years. Furthermore, unlike the mothers in the cases discussed above, mother does not have a pattern of abusive relationships. In fact, there is no evidence that she has ever been involved with an abusive man other than the father.[5] Indeed, there is no evidence that mother has been

---

[5] There was testimony that mother and the father once had a housemate who had a history of sexual abuse and that the older girls went to live with their

involved in any romantic relationships other than her long-term marriage to the father. Thus, this is not a case like *Ettinger* or *Geist*, where mother plans to move the children into a home with a dangerous person. We conclude that, although mother's personality disorder may render her more vulnerable to a potential abusive partner, we cannot say that there is clear and convincing evidence that her condition is, in that respect, "seriously detrimental" to the children.

We next consider whether mother's condition is seriously detrimental to the children in that it interferes with her ability to recognize and meet the children's special needs. We have stated that "consideration of the types of needs a child may have is relevant to assessing the adequacy of the parent's skills in the present and in the future." *State ex rel SOSCF v. Wilcox*, 162 Or App 567, 576, 986 P2d 1172 (1999). We explained that the needs of the children are relevant to a parent's fitness because "minimally adequate parenting skills may be different for a severely disabled child from those for a child that has no disabilities." *Id.* Clearly, although these children are not severely disabled by their special needs, they have special needs that must be recognized and addressed by their caretaker.

█ Although we may affirm termination of a parent's rights if his or her parenting skills are so inadequate as to constitute a serious detriment to the child, we will not do so merely because of an inability to maximize the child's potential. For example, in *State ex rel Dept. of Human Services v. Smith*, 338 Or 58, 87, 106 P3d 627 (2005), the Supreme Court reversed a judgment terminating the mother's rights even though she did not interact appropriately with the child: she failed to make eye contact, to engage the child, or to pick up on his cues. In addition, the mother in *Smith* resisted progress: she refused to read the parenting books provided to her and lacked "insight" as to the importance of the various skills that had been taught to her in parenting programs. The Supreme Court concluded that, although the mother "did not interact with the child at a level that would ensure that the

---

grandparents because of allegations of abuse. However, there is no evidence that mother was ever in a close relationship with that person. Indeed, when asked about him at the termination hearing, mother testified that she could not remember his name.

child necessarily will experience maximum emotional development," the mother's parenting skills were not so inadequate as to constitute a serious detriment to the child. *Id.*

In this case, we also conclude that, although mother struggles with the children's special needs, her parenting skills are not so inadequate as to constitute a serious detriment to the children. Several reasons underlie that conclusion. First, and perhaps most significantly, DHS itself considered mother's parenting skills—even in the face of two special needs children—sufficiently adequate to allow return of the children to mother's care in 2000. It showed even greater confidence in her parenting abilities when it dismissed the dependency petitions the following year. Although there was some evidence that mother struggled with organizational issues after the children were returned, DHS apparently did not consider those issues significant enough to justify continued dependency jurisdiction. In addition, both Basham and mother's therapist, Murphy, testified that mother has made progress, albeit slow progress, in her parenting skills since that time.

Second, although there was some evidence that mother had trouble understanding the full extent of her children's needs, this is not a case in which mother "consistently failed to display even a glimmer of insight into [the children's] needs * * *." *State ex rel Dept. of Human Services v. Simmons*, 203 Or App 279, 310, 125 P3d 66 (2005). Rather, at the termination hearing, mother persuasively articulated how she would meet the boys' special needs. Again, she testified that she would work closely with everyone who works with them and would cooperate with them and implement their suggestions. She would also work to read the boys' mannerisms and facial expressions so that she could be alerted to any problems and be able to address them. In addition, to help them communicate better and to learn about the world around them, she would offer the boys a lot of choices—even for small things like what shirt to wear. She would also teach them the consequences of their choices—how the choices affect them and those around them. She was also aware that, in order to learn, the boys needed a lot of repetition.

Third, mother has taken numerous steps to work on her parenting skills. She has participated in parenting classes, "hands on" training, and therapy. Indeed, mother has done everything that DHS asked her to do. Although there is some evidence that mother has difficulty internalizing her training, this case is, once again, distinguishable from *Simmons*, where the mother made "no progress" as a result of the numerous programs in which she participated. *Id.* The parent educator acknowledged that mother made progress as a result of her efforts. Basham, too, stated that mother had made some gains in her parenting skills as a result of her counseling and parenting classes. In addition, mother's therapist, Murphy, acknowledged that mother had made some progress. For example, she testified that the therapy had helped mother gain a better understanding of what level of supervision was appropriate for the children. Finally, mother herself testified as to her own progress. She testified that she had learned to become better organized, to recognize and mitigate her stressors, and to make better choices. Thus, although mother's progress may be slow, it is real.

Finally, contrary to the state's argument, there is no evidence that mother's deficient parenting skills caused the children's developmental delays. Neither of the children's evaluators was able to identify the cause of the children's delays. In addition, mother has no drug or alcohol issues that negatively affected the children. Indeed, there is no evidence that N or G was ever harmed or traumatized while in mother's—or anyone else's—care. Under the circumstances, and keeping in mind that, by "serious detriment," the legislature had in mind conduct "substantially departing from the norm," *McMaster*, 259 Or at 304, we conclude that mother's parenting skills are not so uncommonly inadequate as to constitute a serious detriment to the children, even with the special needs these children present.

■    Lastly, we address whether mother's condition was seriously detrimental to the children in that it prevented her from maintaining a suitable living situation. We are skeptical that mother's messy home could be considered "seriously detrimental" to the children. *See State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 320, 121 P3d 702 (2005)

(fact that parents' house reeked of cat urine and, consequently, children also smelled of urine, was not sufficient "threat of harm" to justify dependency jurisdiction). We need not make that determination, however, because we conclude that the state failed to establish that mother's home was unsuitable *at the time of the termination hearing*. Although several people testified that in 1999—and again in 2002—mother's home was disorganized and messy, the state proffered no testimony about the condition of mother's home after the children were removed in 2002.

Nor can we say that the condition of mother's home is unlikely to have changed since 2002. *Cf. State ex rel DHS v. Williams*, 194 Or App 57, 94 P3d 131 (2004) (evidence of mother's mental condition not stale where initial diagnoses were several years old but where experts testified that mother's condition was chronic and mother's recent behaviors were consistent with original diagnoses). Since 2002, mother has completed numerous classes to aid her in handling stress and to become more organized. Mother testified that, at the time of the hearing, her home was clean and organized and that she had been keeping it that way. We therefore conclude that the state failed to meet its burden to show that the condition of mother's home, at the time of the termination hearing, was seriously detrimental to the children. Because the state failed to prove that mother suffered from a condition seriously detrimental to the children, termination is inappropriate.

Reversed.