Argued and submitted December 22, 2006, affirmed April 25,
petition for review denied July 24, 2007 (343 Or 160)

In the Matter of
N. L. N., a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

J. L. N.,
*Appellant.*

Lincoln County Circuit Court 991616J3;
Petition Number 058225-DAD; A133260 (Control)

In the Matter of
B. J. N., a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

J. L. N.,
*Appellant.*

Lincoln County Circuit Court 991616J7;
Petition Number 058227-DAD; A133261

158 P3d 1

Frederick L. Bennett, Jr., Judge pro tempore.

Daphne E. Mantis argued the cause and filed the brief for appellant.

Laura S. Anderson, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Ortega, Judge, and Riggs, Senior Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Father appeals from a judgment terminating his parental rights to two of his children, N and B. On *de novo* review, ORS 419A.200(5), we agree with the trial court that the state proved by clear and convincing evidence that, at the time of trial, father was an unfit parent because he was unable to provide safe living conditions for the children, adequately care for their special needs, and refrain from using methamphetamine. We also agree that the children cannot be integrated back into father's home within a reasonable time and that termination of father's parental rights is in the children's best interest. Termination is therefore appropriate. ORS 419B.504 (stating criteria for termination); *State ex rel SOSCF v. Stillman*, 333 Or 135, 145-46, 36 P3d 490 (2001) (interpreting ORS 419B.504).

Because every termination of parental rights case depends to a significant degree on its particular circumstances, we begin by recounting the relevant facts in some detail, including facts that predate the birth of the children in 1998 (N) and 2002 (B).

## I. HISTORY

A. *Father's history before the children were taken from his home*

Father has a history of criminal activity and other antisocial conduct. In 1989, at the age of 20, he was convicted of burglary; in 1990, he was convicted of another burglary, as well as theft, criminal mischief, and unlawful possession of a firearm. In 1992, he violated conditions of his probation. In early 1995, toward the end of a relationship with a methamphetamine user with whom he fathered four children (not the ones at issue in this case and one of whom was born drug-addicted), father was the subject of a Family Abuse Prevention Act restraining order based on domestic violence. Shortly thereafter, father began a relationship with the mother of N and B (mother). During the early years of that relationship, he was convicted of felon in possession of a firearm (1998), and felon in possession of a weapon and the unlawful taking of an elk (1999).

N was born on January 9, 1998. K was born 15 months later, addicted to methamphetamine.[1] She had respiratory problems and a fragile immune system that required that she not be exposed to cigarette smoke; to that end, father signed a service agreement with the Department of Human Services (DHS) agreeing not to smoke in the house. However, in August of 2000, in response to information that conditions in father's home were unsafe, DHS contacted father and found that "the house [was] full of cigarette smoke" and in generally "deplorable" condition. An outdoor play area had broken toys, broken glass, and liquids in unmarked containers, all accessible to the children. As a consequence, the juvenile court entered a shelter order on August 25, 2000, for N and K.[2] After father and mother signed an agreement to create and maintain proper conditions for the home, the children were returned to them. The wardship was dismissed in August 2001.

Two months later, father and mother were arrested for delivery of a controlled substance. Shortly thereafter, while their case was pending, a DHS worker visited the family home and found two known drug users there (other than father and mother). Father ultimately pleaded guilty to two counts of delivery of a controlled substance and, beginning in June 2002, served five months of a one-year sentence.

On October 24, 2002, while father was still incarcerated, B was born. Father was paroled in November and went to work at a gas station in Waldport. He worked there for approximately 30 months; during that time, he was the primary caretaker for N and B and another child, waking them, feeding them breakfast, getting them ready for school, taking B to Early Intervention services (B was born with special medical problems), picking them up from school, preparing dinner, and putting them to bed. During that time—between his release from jail and the fall of 2004—he was also sanctioned three times for illegal use of methamphetamine. Also

---

[1] Although K is not the subject of the termination proceedings at issue in this case, we include some information about father's relationship to her because we find it relevant to his general fitness as a parent.

[2] The order also included several of mother's children and another of father's who were living with the couple at the time and are not the subject of the termination proceedings in this case.

during that period, in September 2004, a DHS social worker visited the family home at the request of the Lincoln County authorities, who reported concerns about methamphetamine use and unsafe conditions. (Father later acknowledged that during that period he had discovered B, then age two, holding a methamphetamine pipe.) The social worker found that father was at work, mother was in jail because of a parole violation, and B and N were being cared for by a registered sex offender. The children were removed from the home.

After father agreed to re-engage in drug treatment (including random urine analysis tests (UAs)) and found suitable housing, N and B returned to their parents. However, in late September 2004, father tested positive for methamphetamine. He submitted yet another methamphetamine-positive UA on October 27, 2004; within a week, DHS removed the children from the family home and filed a petition in a dependency action naming N and B. The juvenile court entered a judgment of commitment to DHS on December 29, 2004, containing the following formal admissions by father:

"1) [Father] has a history of substance abuse issues which have interfered with his ability to adequately care for [N and B], placing [N and B] at risk.

"2) [Father] has failed to provide [N and B] with the care, guidance and protection necessary for the physical, mental, and emotional needs of the children, placing [N and B] at risk.

"3) [Father] has demonstrated a failure to resolve long term substance issues despite services and resources designed to provide [him] with the ability [to] minimally adequately parent [N and B], placing [N and B] at risk.

"4) [Father] exposed [N and B] to inappropriate people, placing [N and B] at risk."

B. *Between removal of children and termination trial*

Between the time that DHS removed N and B from their parents' home until the time of the termination trial, a number of significant events occurred in father's life. In early 2005, he reported to DHS that he was separating from mother and would not allow her to move back to the family

residence when she was released from jail. However, he nonetheless continued to visit her in jail, and, after her release, she was repeatedly found at his residence. On one occasion in July 2005, Lincoln County officers found mother and father at his residence, along with two other adults and a minor. One of the adults had methylsulfanol methane—commonly used to dilute methamphetamine—in his pocket. Methamphetamine in a small glass tube was found under a mattress in the bedroom.

Later that year, in November 2005, father allowed a registered sex offender to stay at his residence.

Father has undergone drug treatment; however, on February 7, 2006, his UA tested positive for methamphetamine. He insists that the positive test was not the result of intentionally ingesting or inhaling the drug. Rather, he stated that he found a glass pipe with residue of methamphetamine and plastic baggies in a doll that was left in the home by mother and that, in the process of destroying those items, he cut himself on the glass pipe and thereby absorbed methamphetamine into his blood stream, and that he inhaled fumes when he burned some of her other items. To support that assertion, father adduced evidence from his drug counselor that father could have "come in contact with trace amounts [of methamphetamine] in the atmosphere" when burning the paraphernalia. There is no indication in the record that the counselor has any scientific credentials. The state's expert witness, a forensic toxicologist, is the scientific director of a federally certified drug-testing laboratory. He testified that the urine sample tested positive for methamphetamine using two different types of testing methods and that the positive UA could not be caused by casual dermal contact or through passive or second-hand inhalation. On *de novo* review, we find that father's explanation for his positive UA is not credible and that some time on or shortly before February 7, 2006, he relapsed at least one time into methamphetamine use.

By the time of the termination trial (July and August 2006), father (according to his testimony) was no longer in a relationship with mother; he had started a new

relationship with AW, who has a criminal history but no record of drug use, violence, or interventions by DHS. He testified variously that he and AW planned to marry, and that there were no such plans. It appears that at least part of the contradictory testimony regarding the exact nature of the relationship was the result of father and AW's concerns with how DHS and the trial court would view the relationship; he explained that, when DHS discovered that AW had a criminal history and made it known that they disapproved, AW declined father's proposal because she thought it would jeopardize his chances of getting N and B back.

In supervised visits with the children, father behaved inappropriately when mother was also present, engaging in "physically escalating play, tickling and roughhousing and behaviors that would—the children would get very hyperactive and sometimes unsafe." Father testified that he intentionally acted badly in order to make mother look bad. When mother was not present, his behavior improved, but he still engaged in unsafe behavior, especially with regard to B. During one visit, father put B (who was approximately two years old at the time) on a table and encouraged him to jump down. According to the DHS worker who supervised the visits, father "displays minimally adequate progress in [his] treatment program. Child safety [was] still an issue," because father lacks the "ability to determine if things were safe or unsafe for the children."

Page, a DHS employee, interviewed N on the day the children were taken into DHS custody. N was six at the time. According to Page,

> "[N] told me that he thought—after I explained to him what my job was, he told me he thought I was there to talk [to] him about his parents' fighting. And he talked to me about a time that his dad was punching his mom while they were on the couch. He said his dad was banging on the plastic part of the couch and that his dad had pulled his mom's hair. When I had been in the apartment earlier, I did observe that there's a plastic sofa as he was describing.
>
> "* * * * *
>
> "[N] * * * was very open about the drug issue. He talked about his mother hiding a pipe so a cop wouldn't find it, but

that his baby brother, meaning [B], had found it. He described the pipe as being one where stuff goes in the front and it's smoked. And when I asked him what the stuff was, he said it was dope, and that the dope was in plastic bags and was hidden in the back of the heater."

An older child in the household, T (who was nine years old at the time), told Page that he had not seen physical fighting between father and mother, but that he often heard them yelling at each other loudly. There is no indication that T said anything about father's or mother's drug use.

At the time of trial, father was earning $10 per hour at a full-time job, living with his parents, and saving money to move into his own place. He testified that he was considering a move to Wyoming; he also testified that he was considering buying a house in Florence on the Oregon coast to be near his sister.

## II. MEDICAL AND PSYCHOLOGICAL EVIDENCE

### A. *Father*

Father underwent two psychological evaluations. One was with James Ewell, Ph.D., by referral from DHS. Dr. Ewell's evaluation, conducted on January 19, 2005, concluded that father suffered from "Methamphetamine Dependence, in early remission by self-report," "Post-Traumatic Stress Disorder, in partial remission," "Borderline Intellectual Functioning," and a "Personality Disorder, Not Otherwise Specified, with Antisocial Features." He also found that "[i]t would be highly unlikely that [father] would be able to meet the individual needs of just [B]," and that "[h]e certainly would not be able to meet the needs of the * * * children involved with DHS." Ewell also found that father was defensive and may have been withholding information, concluding that father's "life was not at a level of stability that would be minimally adequate for a child." He explained:

"I think it's widely known, widely accepted that children need to have a stable living environment, need to have it be consistent, need to have an understanding or a predictability of what's going to occur, need to have the parents be able to be living a lifestyle that is consistent and stable enough

that they can meet the children's needs and respond to those needs. And I did not see in [father's] history or in his current functioning when I saw him, I did not see indicators that he was at that level of stability."

Father later indicated that friends had advised him not to provide too much information to the psychological evaluator.

The second assessment, performed by Dr. Emil Slatick at father's request, reached quite different conclusions. This second psychological evaluation indicated that father's IQ score was average, as would be expected given his educational experience and work history. According to Slatick, many factors can produce an erroneously low IQ score, but it is not possible to artificially or erroneously produce a high score. Slatick concluded that

> "[father] is generally free of disabling psychopathology, significant distress, or highly problematic and entrenched personality characteristics.

> "* * * * *

> "As long as [father] remains in recovery and distances himself from others who use (specifically [mother]), there are no compelling reasons, based on the information obtained during this evaluation, to suggest that [father] should not be an integral part of his children's lives."

(Underscoring in original.)

B.  *Children*

Dr. Kathleen Gillis, a psychologist, evaluated N on February 15, 2006, and testified that N has Attention Deficit and Hyperactivity Disorder (ADHD) and learning problems. In her written report, Gillis stated that "N presents with a higher level of need than the typical child, due to his disrupted upbringing, possible prenatal exposure [to methamphetamine], severe ADHD symptoms, and learning problems." Gillis testified that the cause of N's ADHD could not be determined definitively, but that the lack of a stable home environment (in the future) would put N at a higher risk for more problems, necessitating more therapy, tutoring, and extra attention.

The program director at Options Counseling in Florence, Jayme Marie Smith, also provided counseling to N. She testified that N would "act out" physically in response to conflict and that "just focusing and calming down were real difficult" for N. N would constantly leave his seat at school and would sometimes lie on the desks and roll in the aisles between them. She observed that, after beginning to take medication, N's school behavior improved. She testified that he would need "extra help and support and structure throughout his school years in order to function independently and successfully. And especially if his siblings are going to be raised with him and they all have developmental problems, it is going to take a lot of attention and focus on these children."

Dr. Glenna Giesick, also a psychologist, examined B and determined that, at age two, he was "at least a year behind on most of his functioning, including motor skills, self-sufficiency and communication skills." To address these special needs, Giesick testified that B needs a caregiver who would be willing to work with him on language skills, would be willing and able to provide B with special educational programing, would be in frequent communication with B's caregivers, including therapists and teachers, and would act as an advocate for B in pursuing necessary services.

Bobbie Spencer, an early childhood special education specialist with an early childhood special education program called EC CARES, started providing services for B in November 2005. She found that B was delayed and tested in the lowest percentile in personal-social adaptive skills and fine-motor and gross-motor skills. Spencer testified that B, who was three and one-half years old at the time, is "probably around a 12-month to 18-month old child as far as his communication and cognitive skills." EC CARES provides a special education toddler group for B, makes home visits to assist B's foster mother, and provides speech therapy. Spencer testified that any gap in providing these special services would be a definite concern. She further testified that B will likely be in a special education program through primary and secondary school, and that, without the type of care he is currently receiving (including the stable foster home), there

is a risk that he will not be able to function on his own as an adult.

Both children have had teeth removed because of decay.

## III.  DISCUSSION

■■    The trial court terminated father's parental rights under ORS 419B.504. That statute

> "sets out a two-part test for determining whether to termi-
> nate parental rights, both parts of which must be met
> before the court orders termination. First, the court must
> address a parent's fitness: The court must find that the par-
> ent is 'unfit by reason of conduct or condition seriously det-
> rimental to the child.' That, in turn, requires a two-part
> inquiry: The court must find that: (1) the parent has
> engaged in some conduct or is characterized by some con-
> dition; and (2) the conduct or condition is 'seriously detri-
> mental' to the child. Second—and only if the parent has met
> the foregoing criteria—the court also must find that the
> 'integration of the child into the home of the parent or par-
> ents is improbable within a reasonable time due to conduct
> or conditions not likely to change.' "

*Stillman*, 333 Or at 145 (quoting ORS 419B.504, in part). Additionally, the Supreme Court has held that

> "the focus of * * * the test for termination * * * is on the det-
> rimental effect of the parent's conduct or condition on the
> child, not just the seriousness of the parent's conduct or
> condition in the abstract. Thus, the court first must identify
> the parent's conduct or condition, and then measure the
> degree to which that conduct or condition has had a seri-
> ously detrimental effect on the child."

*Id.* at 146. Finally, the court must also find that termination of parental rights is in the best interests of the child. ORS 419B.500. "[A] parent's fitness must be measured *at the time of the parental rights termination trial.*" *State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 96, 149 P3d 1124 (2006) (emphasis in original). The facts relied on to prove unfitness must be proved by the state by clear and convincing evidence, or admitted by the parent. ORS 419B.521(1). All proven conduct or conditions will be viewed in combination in determining whether father is unfit. *See, e.g., State ex rel*

*Dept. of Human Services v. Radiske*, 208 Or App 25, 49, 144 P3d 943 (2006); *State ex rel Dept. of Human Services v. Rodgers*, 204 Or App 198, 217-18, 129 P3d 243 (2006); *State ex rel SOSCF v. Mellor*, 181 Or App 468, 476, 47 P3d 19 (2002), *rev den*, 335 Or 217 (2003).

Guided by these precepts, we agree with the trial court that the record provides clear and convincing evidence that father had engaged in criminal conduct, habitual use of controlled substances, and substandard parenting or house-keeping; that this conduct was seriously detrimental to the children; that he will, in all probability, fail to change his conduct within a reasonable time; and that termination of father's parental rights is in the children's best interest.[3]

A. *Father's relevant conduct*

1. *Criminal activity*

ORS 419B.504(6) directs the court to consider a parent's criminal conduct. As related above, father has a long history of criminal activity that resulted in convictions for burglary, theft, criminal mischief, unlawful possession of a firearm, felon in possession of a firearm, and delivery of a controlled substance (methamphetamine). He has also engaged in methamphetamine use for at least the four years prior to the termination trial, albeit with at least one lengthy period of apparent abstinence. We also note that ORS 163.575(1)(b) provides that it is a Class A misdemeanor to "endanger[ ] the welfare of a minor" by "knowingly * * * [p]ermit[ting] a person under 18 years of age to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted." Although father has never been convicted of endangering the welfare of a minor, we find clear and convincing evidence that he permitted N and B to "remain in a place where" he and mother possessed and used methamphetamine. Specifically, father found B holding a methamphetamine pipe when B was two years old. After this incident, there is no evidence that father removed N, B, or any of the other children from the family home. Nor did father present any evidence that he took any

---

[3] Because we conclude that the trial court's findings recited above are sufficient to support termination, we do not discuss the court's other findings.

steps to ensure that there were no other drug pipes, drugs themselves, or other drug paraphernalia at the residence.

### 2. *Methamphetamine use*

ORS 419B.504(3) specifies that "habitual use of * * * controlled substances" is conduct that the court must consider in a termination proceeding. Father's numerous positive UAs indicate "habitual use."

### 3. *Substandard parenting or housekeeping*

Although inadequate parenting or housekeeping are not explicitly stated in ORS 419B.504 as factors that the court must consider, we find that they are relevant conduct in considering father's fitness. There is evidence that the households where N and B have grown up (outside of foster homes) were, much of the time, not safe or proper for raising children. Indeed, unsafe and unsanitary conditions were the primary reasons that DHS intervened so often in this family's affairs.

Also relevant to father's parenting abilities is his persistent contact with people who have histories of drug and sex offenses. Avoiding such people would qualify as a parenting skill. The record contains clear and convincing evidence that at two different times, father's children were being cared for by convicted sex offenders. Although it is not clear that father knew that either of these people was a sex offender, father should have been more vigilant in choosing a babysitter. Father also has a tendency to associate with methamphetamine users, as evidenced by the incident on July 20, 2005, when Lincoln County officials found him at home with mother, two other known drug users, and a minor—in addition to methamphetamine itself.

Finally, with respect to father's parenting skills, we note that the children did not receive proper medical or dental care. Although that fact by itself does not establish neglect under ORS 419B.506, *see State ex rel Dept. of Human Services v. Squiers,* 203 Or App 774, 789, 126 P3d 758 (2006), it is relevant conduct under ORS 419B.504 because it is clearly detrimental to the children. When N and B were first taken in as foster children by father's sister, K had to have four teeth removed because of tooth decay. Father's sister

also testified regarding N that "[w]e've had a couple of teeth pulled since he's been with us. Most of them were removed before he came to stay with us." It was father's sister's belief that the tooth extractions were necessary due to tooth decay. There was also evidence that B had a lapse in early intervention care because father and mother had not followed through with the requirements to keep him in the program.

## B.   *Detriment to the children*

Next we consider whether father's conduct has been "seriously detrimental" to the children. *See Stillman*, 333 Or at 149-50 (describing steps in the analysis for determining parental unfitness).

### 1.   *Criminal activity*

Father's criminal conduct up to his methamphetamine delivery and use arrest in 2001 had little, if any, effect on N or B. The only effect of this criminal conduct is an elevated criminal history score, which may increase father's time in custody for subsequent convictions; the more time father spends in jail or prison, the less time he can devote to caring for his children. Although incarceration is the type of condition that can be considered by the court, the mere fact of imprisonment (or possibility of future imprisonment) is not enough to show unfitness. *Stillman*, 333 Or at 147-48. Here, not only was father not incarcerated (or even under supervision) at the time of trial, there is no evidence that father's past incarceration was "seriously detrimental" to his children. On the contrary, father made arrangements for his children to stay with relatives while he was serving his sentence.

### 2.   *Methamphetamine use*

Regarding father's methamphetamine use, which we address in relation to his criminal conduct and habitual use of controlled substances, the state presented direct and circumstantial evidence that the use caused serious detriment to N and B. This case is not like *Stillman*, where the court found that "there is virtually nothing in the record that sheds light on any ill effects that the children might have suffered from their parents' involvement with drugs before the children were placed in foster care." 333 Or at 140. Father

was convicted of two counts of delivery of a controlled substance (methamphetamine) on June 27, 2002. This conviction is indicative of father's past willingness to engage in conduct with controlled substances that is more serious and potentially far more dangerous for the children than mere use, *i.e.*, drug dealing from his home.

As noted above, the Class A misdemeanor of endangering the welfare of a minor consists of "knowingly * * * [p]ermit[ting] a person under 18 years of age to enter or remain in a place where unlawful activity involving controlled substances is maintained or conducted." ORS 163.575(1)(b). Father allowed N and B to stay in the residence even after he found B with one of mother's methamphetamine pipes. Allowing a child to remain in a residence where methamphetamine is used is a serious detriment to that child. Not only is there a risk of inhalation of toxic chemicals in the residence, there is the risk, as happened here, that a child will find methamphetamine or paraphernalia with methamphetamine residue. The legislature, by criminalizing this activity, has clearly made a policy choice that such conduct is detrimental to children.

Indeed, father admitted that his drug use had a negative effect on his children. When questioned by his attorney, father testified as follows regarding his drug use and recovery:

"Q. And what was your realization as to how [your methamphetamine use] affected your children?

"A. I wasn't doing what I was suppose to be doing. I was supposed to keep them safe.

"Q. Mm-hmm.

"A. I didn't do that. You know, I could have walked away and left [mother] a long time ago, and I didn't do it.

"Q. Did you learn a lot from your classes about how to maintain your sobriety?

"A. Yes.

"Q. What skills have you learned in maintaining your sobriety? Are you using those these days?

"A. Yes.

"Q. Is it helpful?

"A. Yes.

"Q. Do you need it? Do you need those skills to maintain your sobriety?

"A. Yes."

### 3. *Parenting and housekeeping skills*

■ Father has failed to learn or assume parenting or housekeeping skills sufficient to provide for the safe and proper raising of the children. The state produced photographs of father's residence as it was on the two occasions when DHS intervened to remove the children because of unsafe and unsanitary conditions. The photographs and testimony provide clear and convincing evidence of dangerous and unhealthful conditions. More seriously, father's inability to refrain from allowing sex offenders and drug users in the home has been detrimental to the children, as it has exposed them to danger. And his neglect of their dental health is also indicative of detrimental lack of parenting skills.

In addressing father's parenting skills, the special needs of the children are proper considerations. *State ex rel SCF v. Ettinger*, 143 Or App 418, 424, 923 P2d 1290, *rev den*, 324 Or 395 (1996). Here, the evidence includes N's and B's evaluations that characterized their development as "delayed," N's diagnosis of ADHD, and the prospect of B needing special education through primary and secondary school. With regard to B's lapse in the Early Intervention program, there is overwhelming evidence that B had special needs that required early intervention if B was going to have any chance of developing into a self-sufficient adult. Given B's special needs, we find by clear and convincing evidence that father's neglect in the form of not engaging proper services caused serious detriment.

N also required special services. Father's lack of engagement in services for N meant that N's ADHD remained undiagnosed and untreated until he was in DHS's

custody. Furthermore, father was resistant to medication to treat N's ADHD. While reluctance to place a child on psychiatric medication certainly does not constitute neglect, there is no evidence in the record to show that father acknowledged N's problems and had any alternative plan for addressing them.

In sum, we find that father did not provide minimally adequate parenting for N and B and that this failure caused serious detriment to them.

C. *Father's condition at the time of trial*

We find that father's use of methamphetamine and his association with known drug users and sex offenders persisted until the time of trial. His positive UA for methamphetamine just two months before trial is perhaps the strongest evidence that he cannot control his addiction. His continued use of methamphetamine is also evidence that, at the time of trial, he was not able to provide for the safe and proper raising of N and B. Despite the steps father has taken to improve his parenting skills, his continued drug use is still a safety concern and has proved harmful to N and B. Further, father continued to associate with mother and other known drug users and with sex offenders. Nine months before trial, mother and another adult were arrested at father's apartment, where methamphetamine was found under a mattress. One of the persons arrested at father's apartment was being investigated for statutory rape, an allegation known to father.

The two psychologists who evaluated father at the time of trial reached different conclusions, as noted above. Ewell's evaluation was largely negative. Slatick's evaluation was significantly more positive. Even Slatick, however, prefaced his conclusion that "there are no compelling reasons * * * to suggest that [father] should not be an integral part of his children's lives" with the following qualification: "As long as [father] remains in recovery and distances himself from others who use * * *." As we have seen, father did not remain in recovery, nor did he distance himself from other users. We therefore do not invest Slatick's prediction with much force.

### D. *Integration of N and B into father's home*

■ Even after finding that father's conduct at the time of trial is seriously detrimental to N and B, in order to affirm the trial court's termination judgment, we must also find that integration of N and B into father's home "is improbable within a reasonable time due to conduct or conditions not likely to change." ORS 419B.504. Echoing the terms of ORS 419B.504(5), the trial court found father culpable for a "lack of effort to adjust" his circumstances or conduct, as well as a "failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected." We agree.

We acknowledge that father has made an effort to adjust his conduct. He engaged in drug treatment and appeared to refrain from drug activity for approximately 16 months, between November 2004 and February 2006. He has completed parenting classes and has attended most of his visitations with N and B. Father's sister, who is currently the foster mother for N and B, testified that father could be ready to care for the children in four or five months.

Nonetheless, father has had over a year to demonstrate his potential for parental fitness, and has instead demonstrated that he cannot refrain from use of methamphetamine or stay away from persons who will put his children at risk. His choices inevitably lead to recurring drug use that places the children in danger—not only of exposure to the drug, but also to the disruption in their lives again if father goes to jail or prison in the future. Given the children's special needs, especially those of B, father's continued methamphetamine use and association with other users of methamphetamine make it "highly probable that [father is] not presently able, and will not be able within a reasonable time, to meet [his children's] physical and emotional needs." *Rodgers*, 204 Or App at 216; *see also Mellor*, 181 Or App at 474. Further, although he plans to live independently in the near future, he has never demonstrated the ability to provide suitable living conditions.

E.  *Best interest*

In light of the findings above, we conclude that the best interests of N and B will be served if they are freed for adoption.[4]

## III.  CONCLUSION

Father's conduct involving drugs, criminal activity, inappropriate associations, and inattention to the physical needs of N and B, including their special needs, have had a seriously detrimental effect on them. That conduct persists, and it is unlikely to change within a reasonable time so as to allow the children safely to integrate into his home. It is in the children's best interest to be freed for adoption. We therefore affirm the trial court's judgment terminating father's parental rights in N and B.

Affirmed.

---

[4] Father's sister and brother-in-law have been identified as appropriate and willing adoptive parents.