201 P.3d 226 (2009)
225 Or. App. 220
In the Matter of M.R.W., a Minor Child.
STATE ex rel DEPARTMENT OF HUMAN SERVICES, Respondent,
v.
D.F.W., Appellant.
In the Matter of M.R.W., a Minor Child.
State ex rel Department of Human Services, Respondent,
v.
S.N.D., Appellant.
05383J, 05383J03, A138073 (Control), 05383J02, A138216.
Court of Appeals of Oregon.
Argued and Submitted June 23, 2008.
Decided January 14, 2009.
*227 James A. Palmer, Eugene, argued the cause and filed the brief for appellant D.F.W.
Megan L. Jacquot argued the cause and filed the brief for appellant S.N.D.
Christina M. Hutchins, Senior Assistant Attorney General, argued the cause for respondent. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.
Before SERCOMBE, Presiding Judge, and BREWER, Chief Judge, and RIGGS, Senior Judge.
BREWER, C.J.
Mother and father separately appeal from a judgment terminating their parental rights to M.W., their daughter. On de novo review, ORS 419A.200(6)(b), we conclude that the Department of Human Services (DHS) has not proved the necessary statutory criteria by clear and convincing evidence as to either parent. See ORS 419.521(1) (establishing standard of proof). We therefore reverse as to both mother and father.
We state the facts as we find them on de novo review.[1] Our fundamental finding is that both mother and father had serious problems at the time that DHS first obtained custody of M.W. and did not significantly *228 address those problems for about a year afterwards. We also find that M.W. developed substantial problems of her own while she was in foster care, problems that either had not previously existed or that her first foster care placement exacerbated. For different reasons, both mother and father began seriously working to resolve their problems in 2006, and a change in M.W.'s foster care placement in 2007 led to significant improvements in her situation. As a result of those changes, the conditions that existed at the time of the termination trial did not justify termination of either parent's parental rights. See State ex rel SOSCF v. Stillman, 333 Or. 135, 148-49, 36 P.3d 490 (2001) (ORS 419B.504 requires parent to be unfit at time of termination hearing in order to justify termination).
Mother and father began their relationship in Yamhill County in 2000 when they were both in their early twenties, and mother had or was about to dissolve her marriage to J.B.[2] M.B., mother's daughter by J.B., lived with mother, as did M.W., after her birth in 2001. Mother was the primary caregiver for both children, but father also was involved with both. In 2002 and 2003, mother believed that M.B. showed signs of sexual abuse and that father was responsible.[3] Father denied any abuse and sexual abuse evaluations of M.B. were inconclusive. Mother ultimately concluded that father was not the source of the behaviors that had concerned her. However, as the evaluator required, mother told father to leave the household at the time of the first evaluation. Until February 2004, father nevertheless continued to be regularly present in mother's apartment and had frequent visitation with M.B. and M.W. At that time, at least in part because of an altercation with father, mother moved from Yamhill County to Lane County without notice to father. From then until DHS obtained custody in 2005, father had no contact with M.W.
Mother has a pattern of entering into abusive relationships with men and then attempting to resist that abuse. She obtained a restraining order against J.B. in 2000. After her problems with father began in 2002, she sought family abuse and antistalking restraining orders against him. Father successfully resisted one order, but mother obtained others. After leaving father, mother had a number of abusive relationships; from mother's description, some of the abuse was extreme. She appears to have obtained one or more restraining orders against almost every man with whom she had a relationship during that period. It is clear from the record, including mother's interactions with Lane County DHS, that, as well as being abused, mother, a former boxer, has a combative personality.
Mother used marijuana and methamphetamine during her teenage years. She testified that she stopped using drugs before M.B. was born and that she remained drug free for some years afterwards. She admitted resuming the use of methamphetamine in 2005, explaining that she did so under pressure from a drug dealer who lived in the same apartment complex and in order to stay awake and protect herself and her children from perceived threats. She also used marijuana and drank alcoholic beverages at that time.
In June 2005, police officers came to mother's apartment in Springfield to investigate an allegedly false police report that she had made. They discovered that the apartment was a mess with clothes strewn around, a smell of stale urine, and a large number of unwashed dishes in the sink and that no nutritious food was available for the children. The officers called a DHS worker, who took M.B. and M.W. into protective custody. During the ride to the emergency foster home, M.B. described how to smoke a bong and said that she wished that mother would stop using drugs.
*229 At a shelter hearing, the court assumed jurisdiction over both M.B. and M.W. and placed them in the custody of DHS. Father did not receive notice of that hearing, but he did receive notice of the later jurisdictional hearing. He supported jurisdiction because he thought that it would give him an opportunity to reconnect with the children. Father and DHS stipulated to an amended petition that referred only to mother's depriving him of contact with the children and to his previous abuse of alcohol and marijuana. Father stated that, at the time of the stipulation, he had been free of both drugs for 59 days. As part of the stipulation, he agreed to complete a psychological evaluation and to participate in any recommended services. Mother also stipulated to jurisdiction.
After her children entered foster care, mother's relationship with the Lane County DHS office was stormy. She was confrontational and demanding, she failed to comply with the requirements of the drug treatment program that DHS offered, and she did not always attend scheduled visitations with her children. On one occasion, mother went to the DHS office wearing a hat that said "DHS stole my babies"; on another occasion she got into an altercation outside the DHS office. Mother complained that DHS did not provide the services that she needed to obtain custody of the children, but she did not use the services that it did provide. She continued to use marijuana and methamphetamine during most of the time that she remained in Lane County, and that use clearly affected her thinking and her actions.
When mother appeared for a psychological evaluation with Dr. Basham in February 2006, she was apparently under the influence of drugs; she admitted having used marijuana the day before. Shortly after the evaluation, mother entered a residential drug treatment program, but she left the program after only a day, explaining that others needed the space more than she did. Basham concluded at the time that it was impossible to work on mother's problems, or even properly to diagnose her condition, until she stopped using drugs. He found her narrative of events to be confusing and contradictory.
Throughout this period, mother's financial situation was poor. She changed residences frequently and was homeless for a time. Any employment that she did obtain did not last. Shortly after Basham's psychological evaluation, mother moved from Lane County back to Yamhill County. Although the details are not entirely clear, she spent some time in a shelter home for victims of abuse, and some of the time she lived with her parents, from whom she had been estranged for many years.
After mother returned to Yamhill County, her attitude toward DHS began to change, and she became more willing to make necessary changes in her conduct. Her relationship with the DHS worker in Yamhill County was better than her relationship with the Lane County DHS workers. In Yamhill County, mother accepted the services that the worker offered, worked hard to succeed at them, and in general made a serious commitment to changing her life. She stopped using drugs and alcohol regularly and, possibly, entirely. Although she was unable to enter a residential drug treatment program in Yamhill County, she participated in the available program on an outpatient basis, attending treatment sessions two to three times a week. Lane County DHS, which retained jurisdiction over M.W., discounted the reports of mother's improvement and did not fully understand the nature of the programs in which she participated.
Basham saw mother again for an evaluation in October 2006. At that time, he concluded that mother was making substantial progress but that the outlook was guarded because the improvement was recent and there was a continuing risk of a relapse. Basham made an Axis I diagnosis of cannabis and amphetamine dependence, in early sustained remission, and an Axis II diagnosis of antisocial, paranoid, and schizotypal personality traits. He noted, however, that the Axis II conditions were common with drug use and would probably diminish as mother progressed in her treatment.
As Basham indicated, mother has made significant progress in ending her drug addictions. Beginning in August 2006, her urinalyses were clean. In addition to participating *230 in treatment programs, she was active in 12-step groups. By the time of the termination trial, she sometimes acted as the facilitator for the groups. By March 2007, she was willing to take responsibility for her children's situation rather than continuing to blame DHS. She completed her chemical dependency treatment in July 2007. Her counselor testified that mother did exceptionally well in treatment. There is some evidence, which we discuss in detail below, that in the fall of 2007 mother sought marijuana and alcohol. Even accepting that evidence, we find that mother remains committed to staying clean and sober and has been generally successful in doing so.
In October 2007, Dr. Sorensen conducted a follow-up evaluation of mother in preparation for the termination hearing.[4] He described significant problems in her past with important recent improvements; he was uncertain whether she could sustain those improvements. Her parenting knowledge was at least reasonable, although she remained defensive about the effect of her previous actions on her children. Overall, Sorensen concluded that there was reason for hope even though mother's recovery was in the early stage, and she still had a great deal to overcome. His Axis II diagnosis was borderline personality disorder, which reflected mother's significant difficulty in regulating her emotions. Because of that emotional volatility, a person with borderline personality disorder may have difficulty as a parent, particularly with a child who has some of the problems that M.W. has shown. Sorensen commented that mother's case was mild, and he recommended dialectical behavioral therapy if it was available in her community. Dr. Giesick, a psychologist who had previously evaluated M.W., testified at the hearing that people with borderline personality disorder typically respond very well to that therapy. After learning of Sorensen's recommendation, mother sought out the therapy and was scheduled to begin it shortly after the hearing. Sorensen testified that that was a positive step.
Mother had regular visits with M.W. while she was in Yamhill County, most of them coming after DHS had returned custody of M.B. to her father. DHS was concerned, from its observations of the visits, that mother did not respond to M.W.'s desire for closer physical contact or to her other cues and that mother did not recognize M.W.'s problems. Mother appeared to focus more on M.B. than on M.W. when they were still together in foster care. Mother had a habit of snapping her fingers to emphasize a directive to the children, as her parents had done with her. She did not realize that that habit scared the children until a DHS worker finally pointed that out. Thereafter, she had worked on stopping the habit. Mother also attempted to apply the techniques that she had learned in her parenting class and suggested to the foster parents that they use some of those techniques in dealing with M.W.'s problems. DHS workers did not tell mother about some of their other concerns, thus making it difficult for her to change her actions in ways that they would have preferred.
In part because of the parenting classes that she took after her return to Yamhill County, mother's parenting skills improved significantly. By the time of the termination trial, J.B. had seen substantial improvement in mother and had begun to permit her to have regular overnight visits with M.B. at mother's apartment. A therapist who specializes in parent-child bonding observed mother's interactions with M.W. during several supervised visits and concluded that the two were closely bonded.
While in Yamhill County, mother received vocational training and began working as a waitress at a restaurant. That restaurant closed down, but at the time of trial, she was preparing to start work as an assistant manager at a fast food restaurant that was about to open. In short, mother's situation at the time of trial was substantially better than it was when DHS removed the children.
Father also experienced significant changes while M.W. was in foster care. He works as a heavy equipment operator and *231 during this period never had difficulty finding employment; he was satisfied with his level of income. Father visited M.W. regularly during the first six months after the court took jurisdiction over her, and the visits were generally successful. His problems were not economic but the result of his personal history. He had used drugs, primarily marijuana, since he was a teenager, at least in part as self-medication for his bipolar disorder and occasional suicidal thoughts. He had had mental health counseling during many of his teenage years. As one of the requirements of his stipulation to the court's jurisdiction over M.W., father participated in drug counseling in 2005. He did not complete that counseling, and his urinalyses continued to show marijuana metabolites throughout that year. In February 2006, when he met Basham for a psychological evaluation, father asserted that he had stopped using marijuana shortly before and stated that he participated in AA meetings twice a week. At the same time, father expressed hostility toward counseling in general and viewed his participation in the services that DHS required as an imposition. He showed little insight into what M.W. needed and what it takes to be a parent, although he asserted that he had had more involvement in her life than mother indicated.
Although mother sought restraining orders against father beginning in 2002, the most important of those orders recognized father's visitation rights with both children and permitted nonoffensive contact with mother related to visitation. Thus, father continued to be at mother's home until 2004, either because his contact was within the limits of the order or because mother did not object. Father, however, at times had contact beyond what the order permitted or mother would accept. In June 2003, he received a sentence of two days in jail and one year of probation for a misdemeanor violation of the order. In January and February 2004, his actions contributed to mother's decision to move to Lane County, which deprived father of contact with the children until September 2005.
In August 2004, father pleaded guilty to a felony violation of the restraining order based on his actions in early 2004. He received a downward departure sentence of 36 months' probation. However, he failed to comply with the conditions of his probation, particularly the requirement that he stop smoking marijuana. Basham noted at the time of father's evaluation in February 2006 that father was anxious about an upcoming probation violation hearing. Soon after that evaluation with Basham, father admitted that he had violated his probation by smoking marijuana and received a sanction of 30 days in jail. Rather than serving that jail term, father left the state without permission and stayed away until August 2006. He spent much of that time in Iowa, where his mother lives. He worked while he was in Iowa and kept in touch with his probation officer; he testified that he always intended to return to Oregon. When he did so, the court revoked his probation and sentenced him to 19 months' incarceration; he served more than 14 months of that sentence.
Father quickly became a model prisoner, using his time in prison to work on many of his problems. He obtained his GED and tutored other prisoners who were working on their GEDs. He has a facility in languages, having attended a Japanese immersion school as a teenager, and taught himself Inuktitut, the language of the Inuit. He became a clerk for the inmate work program, one of the most desirable jobs in the institution. In that position, he handled inmate requests for jobs, prepared reports and presentations, and spoke to a group of new prisoners every week. He had no disciplinary write-ups. His supervisor at the prison testified strongly in his favor at the termination hearing.
Because of father's relatively short sentence and the schedule of the drug treatment program that the prison offered, he was unable to take that program. He testified at the hearing that he had not smoked marijuana since he entered prison, although he had had the opportunity. His urinalyses have been clean for drugs. At the hearing he also testified that he recognized that he needed to go through a full drug treatment program and that he intended to do so.
*232 Father was able to complete a prison parenting program, which gave him a better understanding of the needs of a child and the demands on a parent than he had had when he met with Basham. He regularly sent M.W. cards and letters while he was in prison, but he had no direct contact with her. DHS refused to permit M.W. to attend father's graduation from his parenting class, as the children of the other members of the class did. After father's release in December 2007, DHS permitted him to have one visit with M.W. Although before the visit, M.W. was concerned about whether she would recognize father, the visit went well. He met with DHS workers a week later to discuss M.W.'s situation and showed a good understanding of the information that they provided. However, DHS refused to permit additional visits on the ground that his rights were to be terminated and M.W. had already grieved the loss. At the hearing, father presented the outlines of a plan for having custody of M.W. that was at least superficially plausible; we discuss it in more detail below.
Father's actions have been far from perfect. Shortly after leaving prison he violated his parole by drinking alcohol; during the course of the termination hearing he completed the community service sanction that he received for that violation.[5] Nevertheless, we conclude that father is substantially better prepared to be a parent to M.W. than he was when he entered prison.
M.W. showed significant problems while she was in foster care. It is difficult to determine the extent to which the problems existed at the time that DHS obtained custody and the extent that they were the result of the nature of the foster care. It is clear that a significant cause of M.W.'s problems is the nature of the foster home in which she lived for two years. Her separation from mother and, after a period, from M.B., also upset her.[6] The foster parents attempted to create a firm and disciplined household that met the children's physical and educational needs, but it also was an emotionally cold household. The foster parents did not bond with the girls. Until DHS asked them to stop, they discussed M.W.'s problems with DHS while M.W. was present and able to hear what they said. During her psychological evaluation with Giesick, M.W. described the foster mother as the person who yelled at her and who broke promises.
M.W. responded to the foster home and to her separation from mother by withdrawing into herself and acting out in various ways that included purposely wetting herself and spreading feces on her bedding. She also tended to be argumentative with adults and to resist complying with instructions. In addition to the adjustment disorder, M.W. was hypervigilant, constantly worried about how others, including mother, would react to her and anxious about what they might do. Hypervigilance is often a result of being in an abusive or unstable environment. M.W.'s hypervigilance continued throughout the entire period of her first foster placement. However, that condition declined and ultimately almost disappeared after she was placed with a different family. Her visits with mother and father generally went well at the time of the visit, but they left her more upset because they emphasized her lack of permanence.
Giesick evaluated M.W. in July 2006 and testified at the termination trial. As part of the evaluation, Giesick asked M.W. to identify her family. In response, M.W. drew a house but did not draw anyone inside it, although she said that mother, father, M.B., and she were in it. When Giesick asked who were the important people in her life, M.W. named several people as important in different ways, with her grandparents receiving the most positive comments. Giesick concluded that M.W. was suffering from an adjustment *233 disorder at least in part as a result of being placed in foster care and that the disorder had the possibility of becoming a conduct disorder if it continued. A counselor who saw M.W. for several months in 2006 reported that she made no progress; in the counselor's opinion, the reason was that M.W. had no one with whom she could bond. A social worker testified that the foster parents merely took M.W. to her counseling appointments and picked her up afterwards; they did not interact with the counselor or involve themselves in the counseling. In short, M.W.'s stay in the foster home made her previous problems worse and may have created new ones.
In August 2007, the court held a permanency hearing at which it decided to implement the alternative plan of adoption for M.W. Even before the hearing, DHS moved M.W. from her first foster home to one that specialized in preparing children for adoption. The parents in that home were warm and loving and worked on M.W.'s problems with her counselor. M.W. was ready to start first grade, and the new foster mother homeschooled her along with the foster parents' own child. M.W. quickly responded to the changed environment. Her acting out and hypervigilance almost disappeared, and she did well in her school work, showing a particular aptitude for math. Her visits with mother also were better, in part because M.W. had improved and in part because mother was applying what she had learned in her parenting classes. By fall 2007, mother would listen to what M.W.'s social worker said, even if it was difficult for her to hear, and she would apply what she heard during her visits. Thus, at the very time that DHS was preparing M.W. for adoption, mother was making gains in her parenting skills and in her relationship with M.W.
Father visited M.W. until he left Oregon in early 2006. He did not see her again before he entered prison shortly after his return. At least after he was served with the termination petition in March 2007, he wrote to M.W. and sent her cards through DHS. He also sent M.W. a check, but DHS refused to give it to M.W. and returned it to father's trust account at the prison. As discussed above, DHS also refused father's request that it permit M.W. to attend father's graduation from his parenting class, as the children of the other participants did. After father left prison, DHS allowed father one visit with M.W. Although M.W. was concerned before the visit about whether she would recognize father, the visit went well and it was clear that M.W. was attached to father. A week later, M.W.'s DHS worker met with father to discuss M.W.'s situation. The worker believed that father understood both M.W.'s needs and what was necessary to be her parent, but DHS nevertheless refused to permit any additional visits. It explained that father's rights were to be terminatedalthough the termination hearing had not yet occurred and the trial court had not ruledand that M.W. had already grieved the loss.
We turn to the issue whether those facts support the termination of either parent's parental rights. ORS 419B.500 authorizes a court to terminate a parent's rights if the court finds, first, that the criteria for termination stated in other statutes are met and, second, that termination is in the best interests of the child. Because we find that DHS has not established the statutory criteria for termination, we do not consider whether termination would be in M.W.'s best interests. DHS relies on ORS 419B.504 to establish the criteria for terminating mother's parental rights and on both ORS 419.504 and ORS 419B.506 to establish the criteria for terminating father's rights. Although both statutes give nonexclusive examples of actions and conditions that satisfy their requirements, we will focus on the specific allegations that DHS made in the termination petitions and that the trial court found that DHS had proved. We will assume that proof of any of those allegations would provide grounds for termination. We begin with the allegations against mother.
The dispositive portion of ORS 419B.504 provides:
"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the *234 child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."
In Stillman, the Supreme Court explained that the statute establishes a two-part inquiry. The court must find, first, that the parent has engaged in some conduct or is characterized by some condition and that that conduct or condition is seriously detrimental to the child. Second, the court must find that that conduct or condition is unlikely to change and that, as a result, integration of the child into the parent's household is improbable within a reasonable time. The focus of the test is on the detrimental effect of the conduct or condition on the child, not merely the seriousness of the conduct or condition in the abstract. 333 Or. at 145-46, 36 P.3d 490. Stillman and several other cases provide examples of conduct and conditions that may or may not justify termination under ORS 419B.504. We therefore discuss them in some detail. See State ex rel Dept. of Human Services v. J.L. N., 212 Or.App. 266, 268, 158 P.3d 1, rev. den., 343 Or. 160, 164 P.3d 1161 (2007) (every termination case depends on its particular circumstances).
At the time of the termination hearing in Stillman, the father was in federal prison on drug charges. He had four months remaining on his sentence and would probably spend some time in a halfway house on his release. As a result, it could have been a year before he would be ready to provide a home for the children. The father submitted evidence that indicated that he had made substantial progress while in prison, including successfully participating in drug treatment programs, completing parenting classes, and completing a real estate class. There was little evidence in the record concerning the children, who were in foster care with members of father's extended family. The trial court terminated the father's parental rights, primarily on the ground that the children needed permanency immediately. We reversed that judgment, State ex rel SOSCF v. Stillman, 167 Or.App. 446, 1 P.3d 500 (2000), and the Supreme Court affirmed our decision.
In its opinion, the Supreme Court first emphasized that the court is to consider the parent's situation at the time of the hearing, not at some earlier time. Stillman, 333 Or. at 149, 36 P.3d 490. In that light, it concluded that the extended period before the father would be able to have custody of the children was conduct or a condition that satisfied the statutory criteria for a finding of unfitness. However, the children were doing well in foster care with a member of their extended family and were receiving support from other members of that family. They had a strong relationship with their father, who had telephoned and written them throughout his incarceration. Although they were anxious about their father, and there was testimony that they needed permanency, that anxiety was not in itself the sort of serious detriment that would justify termination. Id. at 149-53, 36 P.3d 490.
In State ex rel Dept. of Human Services v. Simmons, 342 Or. 76, 149 P.3d 1124 (2006), the mother, who had serious physical problems and was addicted to drugs, had made significant improvements in her situation and her ability to be a parent by the time of the termination hearing. The Supreme Court again emphasized that the court must measure the parent's fitness at the time of the hearing, not at some earlier time. Id. at 96-97, 149 P.3d 1124. It also held that a parent's history of drug abuse, if the parent has successfully addressed it at the time of the hearing, is not conduct or a condition that necessarily renders the parent unfit at the time of trial. Although the mother had a personality disorder that led her to be "inflexible, over-controlled, self-centered, and overly desirous of appearing in a positive light," that disorder did not have a seriously detrimental effect on the child at the time of the hearing. Id. at 100, 149 P.3d 1124. When the child began foster care, she was extremely anxious and parentified as a result of her worry about the mother and about the possibility of being abandoned. Since then, both the mother and the child had improved markedly. The mother now accepted responsibility for the problems and the child understood that she was not responsible for the mother. The mother and the child clearly loved each other and were extremely affectionate *235 with each other during visitations. Even though the mother's behavior was not exemplary in all regards, there was not clear and convincing evidence of substantial detriment to the child. Id. at 100-03, 149 P.3d 1124. For those reasons, the court reversed the trial court's decision terminating the mother's parental rights.
Stillman and Simmons have informed our subsequent termination decisions, including those where the evidence has led to different results. In State ex rel Juv. Dept. v. J.L.M., 220 Or.App. 93, 184 P.3d 1203, rev. den., 345 Or. 158, 190 P.3d 379 (2008), the father did not engage in any services in the two years before he began serving a 24-month prison sentence. While in prison, he completed a drug treatment program, but he failed to participate in services or to be honest with his parole officer after his release. He had little contact with the child during this entire period. We upheld the trial court's judgment terminating his parental rights.
In State ex rel Juv. Dept. v. F.W., 218 Or.App. 436, 180 P.3d 69, rev. den., 344 Or. 670, 189 P.3d 25 (2008), both parents had extensive histories of drug use, and the children had cycled in and out of foster care. Both children developed psychological problems as a result of the stress that their situation created. After a number of relapses, the father began seriously working on his drug and other problems. A psychologist testified that it would take a year to 18 months from the time of the trial before father was ready to be a parent to the children, who continued to have serious problems. We reversed the trial court's decision denying termination. In doing so, we observed that the Supreme Court in Simmons did not give an open-ended license to parents "to engage in cycles of treatment, relapse, and recovery while their children remain in the foster care system." Id. at 461, 180 P.3d 69.
On the other hand, in State ex rel Dept. of Human Services v. L. S., 211 Or.App. 221, 240-43, 154 P.3d 148 (2007), we held that a significant risk that the mother would relapse into drug use did not justify termination of her parental rights, because the evidence showed that she had not used drugs for more than a year before the hearing. There was thus insufficient evidence that she was presently unfit. We also held that evidence that the father had had anger management problems in the past did not justify termination when some of that anger arose from frustration with the agency's processes, the father had, after original resistance, worked to control his anger problems, and his interactions with the child were positive.
We consider the facts of this case in the context of the range of situations that those cases exemplify, beginning with the evidence concerning mother. As the statute and Stillman require, we evaluate that evidence in light of what it shows about her conduct and conditions as they existed at the time of the hearing. The trial court found that DHS had proved the following allegations in paragraph 5 of its petition, all of which arose under ORS 419B.504:[7]
"b) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
"c) Exposure of the child to domestic violence.
"* * * * *
"e) Failure to present a viable plan for the return of the child to the parent's care and custody.
"* * * * *
"g) Mental, emotional, or psychological abuse of the child.
"h) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.
"* * * * *
"k) Physical and emotional neglect of the child.
"l) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent *236 possible, or failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."
We find without further discussion that that there is not clear and convincing evidence to support the allegations of subparagraphs c), g), and k) as of the time of the hearing. There is also not clear and convincing evidence that mother's actions before that time suggest that M.W. would be subject to a substantial risk of those things if mother regained custody.
We next find that there is not clear and convincing evidence to support the allegations of subparagraph l). In the year before the termination trial, mother made substantial efforts to adjust her circumstances, conduct, and conditions to make it possible to return M.W. to her custody, and she had substantial success in doing so. We cannot say that it appears reasonable that no lasting adjustment can be effected. Similarly, there is not clear and convincing evidence to support the allegations of subparagraph h). If mother had a mental or emotional illness at the time of the hearing, it was borderline personality disorder. When mother learned of that diagnosis, she immediately sought out dialectical behavioral therapy, which Sorensen recommended and which Giesick testified is an effective treatment for that disorder. In light of mother's recent and generally successful efforts to resolve her other problems, it appears that she will work diligently on this condition. Thus, there is no clear and convincing evidence that mother's mental or emotional illness is of a nature and duration that would render her incapable of providing care to M.W. for an extended period of time. Unlike the parents in F.W., mother is making steady progress rather than showing a continuing cycle of treatment, relapse, and recovery.
There is more evidence to support allegation e), concerning mother's failure to present a viable plan to return M.W. to her care and custody. Mother's situation has certainly improved; she is employed and has a home that is sufficiently safe for M.B. to visit regularly. She did not, however, present a plan for M.W. to live with her permanently, and she will not be able to develop such a plan until she undergoes further therapy. On the other hand, DHS did not assist mother in working on such a plan after it decided to seek adoption rather than reunification for M.W. It appears that, if mother continues on her current course, she will be able to create a plan for M.W.'s return within a reasonably short period. In the meantime, M.W. is doing well in her current foster home, which is not a potential adoptive home. She also continues to see mother and is closely bonded to her. We recognize that it is important to M.W. to have a home that she knows will be permanent and in which she can feel secure. Thus, any further delay is unfortunate. However, as in Stillman, given the time that M.W. has already been in foster care and her need to recover from the negative effects of the first foster placement, there is not clear and convincing evidence that the necessary delay before she can return to mother is seriously detrimental to M.W. We therefore find that DHS has not proved the allegation of subparagraph e) by clear and convincing evidence.
The allegations that cause us the most concern are those in subparagraph b), relating to mother's use of drugs and alcohol. As we have described, mother successfully completed drug treatment and remains active in 12-step programs. However, two witnesses testified that she used alcohol and marijuana in September 2007, several months before the hearing. One witness was a person with whom she had a short relationship; the other was a potential employer. The two witnesses are friends; mother met the first witness through the second. Both witnesses were impeached. The first witness needed a commercial driver's license for his job and, as a result, was subject to random urinalyses, a situation that made smoking marijuana highly risky for him. Mother worked for the second witness for a short period, and the witness decided to pay her under the table for reasons that are not fully clear. The trial court nevertheless believed those witnesses. They testified by telephone, so the extent to which the trial court based its credibility *237 determination on their demeanor is not entirely clear. However, they were neutral witnesses whom DHS discovered during the course of the hearing; the first, at least, was testifying, in part, against his own interest.
Based on that testimony, we find that, despite her protestations, there have been occasions when mother has relapsed from being clean and sober. However, what DHS alleged is that she engages in "[a]ddictive or habitual use" so that her "parental ability has been substantially impaired." In light of the other evidence of mother's commitment to overcoming her alcohol and drug problems and of her success in doing so, we cannot say that there is clear and convincing evidence that any use at the time of the hearing was either addictive or habitual or that it had substantially impaired her parental ability. We remain concerned about the possibility of a more serious relapse; it is important that mother not return to her previous patterns. However, because we cannot find that there is clear and convincing evidence to support any of the allegations against mother, we must reverse the judgment terminating her parental rights.
We turn to the allegations against father. The trial court found that DHS had proved the following allegations of paragraph 5 of its petition, all of which arise under ORS 419B.504:
"a) Criminal conduct that impairs the parent's ability to provide adequate care for the child.
"b) Incarceration that impairs the parent's availability to provide adequate care for the child.
"c) Addictive or habitual use of intoxicating liquors or controlled substances to the extent that parental ability has been substantially impaired.
"d) Exposure of the child to domestic violence.
"* * * * *
"f) Failure to present a viable plan for the return of the child to the parent's care and custody.
"* * * * *
"h) Mental, emotional, or psychological abuse of the child.
"i) An emotional illness, mental illness, or mental deficiency of such nature and duration as to render the parent incapable of providing care for extended periods of time.
"* * * * *
"k) Physical and emotional neglect of the child.
"l) Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible, or failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected."
We find that the evidence in support of allegations in subparagraphs a), b), d), h), and k) is not clear and convincing and reject them without further discussion, except to note that any evidence supporting those allegations arose from events that occurred some time before the hearing, not from father's situation as it existed at the time of the hearing.
Father has been treated for bipolar disorder and for suicidal ideation at various times, beginning when he was a teenager. Those conditions constitute mental or emotional illnesses that are within the scope of the allegations in subparagraph i). Father's long-term marijuana use is at least in part related to his former attempts to deal with those illnesses. Some of father's testimony at trial indicates that he still experiences at least the manic phases of his bipolar disorder. In addition, as father recognizes, he still needs drug treatment in order to be able to be a parent to M.W. However, in light of father's substantial improvement and willingness to continue his progress, we cannot find by clear and convincing evidence that those illnesses render him incapable of providing care for an extended period of time. For the same reason, we cannot find by clear and convincing evidence that he has failed to make the necessary effort to adjust his circumstances, conduct, or conditions in order to make the return of M.W. possible. We *238 therefore reject the allegations in subparagraph l).
Unlike mother, father presented a plan for M.W.'s return to his care and custody. He testified that he was currently employed at $16 an hour and expected a raise to $18 an hour in 90 days. He had a plan for fulfilling the remaining financial obligations that arose from his previous actions. Once he has done so he will be able to drive and may be able to get a higher-paying job. At the time of the termination trial, father was living with his own father and stepmother in a portion of their house that has a separate entrance and that can function as an independent apartment. Father intends, if given custody of M.W., to have her live with him in that portion of the house until he is able to obtain his own living quarters. She would attend a private school and would have her cousins as playmates. He estimated that he would be ready to have M.W. in his care in six to 12 months. DHS has not evaluated this plan, and we cannot say it would be satisfactory. Among other things, the plan would require M.W. to stay in foster care for a substantial period. However, mother probably will be ready to have custody of M.W. before father, and father's plan is more relevant to his visitation with M.W. than it is to her residential plan. For this, among other reasons, we cannot say that there is clear and convincing evidence that father has failed to present a viable plan for M.W.'s return to his care and custody in a way that is seriously detrimental to M.W. We therefore reject the allegation of subparagraph f).
Father denies having used marijuana since he entered prison, and there is no evidence to contradict that denial. He admitted that he drank some wine on the occasion that led to his sanction for a parole violation, but he testified that he has not consumed alcohol since. There is evidence that father drank more than he admitted. Father's father testified that father had had a few beers at their home shortly after leaving prison. However, that witness also testified that father stopped drinking beer after receiving the parole sanction and that beer is no longer available to father at the house. Although father was not fully candid about his alcohol use immediately after his release from prison, the evidence in the record does not show that, at the time of trial, father was involved with either alcohol or drugs to an extent that would substantially impair his ability to be a parent. For that reason we cannot find by clear and convincing evidence that DHS has proved the allegations of subparagraph c).
The trial court also found that DHS had proved two allegations in paragraph 6 of its petition. DHS brought those allegations under ORS 419B.506, which provides for termination of a person's parental rights if
"the parent or parents have failed or neglected without reasonable and lawful cause to provide for the basic physical and psychological needs of the child or ward for six months prior to the filing of a petition. In determining such failure or neglect, the court shall disregard any incidental or minimal expressions of concern or support[.]"
The court found that DHS had proved the following allegations under that statute:
"a) Failure to provide care or pay a reasonable portion of substitute physical care and maintenance while custody was lodged with others.
"b) Failure to maintain regular visitation or other contact with the child which was designed and implemented in a plan to reunite the child with the parent."
In evaluating a petition under ORS 419B.506, we focus on the six months immediately before DHS filed the petition. See State ex rel Juv. Dept. v. Johnson, 165 Or. App. 147, 160, 997 P.2d 231 (2000). DHS filed the instant petition on February 15, 2007, almost exactly six months after father entered prison. Thus, the question is whether father neglected M.W. in the ways that DHS alleges during his first six months in prison. Father did not provide care for M.W. while he was incarcerated, and DHS does not suggest that he could have done so. He had paid some support in the immediately preceding months through deductions from the wages that he received for his work in Iowa. There is no evidence that father was able to pay any portion of the cost of substitute care and maintenance during his first six months *239 in prison, so we cannot find by clear and convincing evidence that he failed to pay a reasonable portion. For that reason, we find that DHS has not proved the allegations of subparagraph a) by clear and convincing evidence.
Father did not visit M.W. after he left Oregon in early 2007. He did not attempt to contact her again until after he was served with the termination petition. However, before he went to prison, DHS had changed its plan for M.W. from reunification to adoption. As a result, there is no evidence that there was a plan to reunite M.W. with father during the six months before DHS filed the petition. Thus, there is no evidence that father failed to comply with the visitation or other contact provisions of such a plan. Indeed, DHS's refusal to permit M.W. to attend father's graduation from his parenting class, and its refusal to permit father more than one visit with M.W. after his release, on the ground that M.W. was going to be adopted and had already grieved the loss of father, suggest the contrary. DHS has failed to prove the allegations of subparagraph b) by clear and convincing evidence.
Because we find, on de novo review, that DHS has not proved any of the allegations against either mother or father by clear and convincing evidence, we reverse the judgment terminating their parental rights to M.W.
Reversed and remanded.
NOTES
[1] The trial court found that mother and father were not credible witnesses, stating that their testimony was contradicted by believable witnesses. Although we give considerable weight to a trial court's credibility finding that is based on a witness's demeanor, see State ex rel Juv. Dept. v. Geist, 310 Or. 176, 194, 796 P.2d 1193 (1990); State ex rel Juv. Dept. v. G.P., 131 Or.App. 313, 319, 884 P.2d 885 (1994), we give little weight to a credibility finding that turns on other factors, such as internal consistency, logic, and corroboration. We are as able as the trial court to evaluate those other factors. See D'Abbracci v. Shaw-Bastian, 201 Or.App. 108, 126, 117 P.3d 1032 (2005). As we discuss in the body of the opinion, the trial court may have based a portion of its determination on demeanor. However, with the exceptions that we discuss, our de novo review of the record leads us to accept much of mother's and father's testimony.
[2] Although the record is not fully clear, mother and father may have maintained separate residences during their relationship. If so, father was frequently at mother's residence and may have lived there for a time.
[3] Mother had been the victim of sexual abuse by her older brother during her pre-teen years and as a result was particularly sensitive to that possibility.
[4] Mother assigns error to the trial court's admission of Sorensen's report and testimony on the ground that the court did not have the authority to order her to submit to an examination with him. We reject that assignment without discussion.
[5] DHS argues, based on the testimony of father's parole officer, that father would not perform the required community service and would therefore face another 90 days in jail. However, the parole office testified before the deadline for father to finish the community service; father, testifying after the deadline had passed, stated that he had done so.
[6] While M.W. was in the foster home, DHS returned M.B. to the custody of her father, J.B., who had remarried, and the court terminated its jurisdiction over M.B. Although M.B. had a tendency to bully M.W., both girls missed each other after the separation.
[7] We list the allegations by the subparagraph numbers in the petition, ignoring those allegations that the court did not find that DHS had proved.