No. 32　　　　　January 28, 2026　　　　　609

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of M. E. B.-T.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*
*and*

F. J. T.,
*Respondent,*
*v.*

M. E. B.-T.,
*Appellant.*

Yamhill County Circuit Court
24JU03509; A187611

Cynthia L. Easterday, Judge.

Submitted October 30, 2025.

Aron Perez-Selsky and Michael J. Wallace filed the brief for appellant.

Dan Rayfield, Attorney General, Benjamin Gutman, Interim Deputy Attorney General, and Inge D. Wells, Assistant Attorney General, filed the brief for respondent Department of Human Services.

No appearance for respondent F. J. T.

Before Shorr, Presiding Judge, Powers, Judge, and O'Connor, Judge.

SHORR, P. J.

Reversed and remanded.

**SHORR, P. J.**

Child, M, appeals from a judgment dismissing a petition filed by the Oregon Department of Human Services (ODHS) to terminate the parental rights of mother. M raises one assignment of error and contends that the juvenile court erred in dismissing the petition terminating mother's parental rights, and specifically in concluding that the evidence was insufficient for it to find that integration of M into the home within a reasonable time was improbable due to conduct or conditions not likely to change. ODHS filed a response in which it agrees with M that the judgment dismissing the termination petition should be reversed. Mother did not file a responsive brief and does not appear on appeal.[1] Upon review of the record, we find that there was clear and convincing proof that integration of M into mother's home within a reasonable time was improbable. Therefore, we reverse and remand for further proceedings.

We review *de novo*. ORS 19.415(3)(a). The juvenile court took jurisdiction of M on May 19, 2023; M was 4 years old. The proven jurisdictional bases included that "mother's mental health interferes with her ability to safely parent the child," "mother's lack of parenting skills interferes with her ability to safely and appropriately parent the child," "mother does not understand the basic needs of her child and lacks the skills necessary to safely parent the child," and "mother's neglect and lack of adequate supervision places the child at risk of harm." Mother was ordered at disposition to perform various tasks, including to participate in a mental health assessment with an ODHS approved provider and successfully complete any recommended treatment. She was also ordered to participate in a comprehensive psychological evaluation with an ODHS approved provider and successfully complete all recommendations and services associated with the evaluation.

Since ODHS became involved with this family in early 2023, mother has been angry, hostile, and uncooperative with ODHS and, at times, exhibited bizarre behaviors, such as standing in the corner of the room and quacking like a duck rather than participating in the meeting. She was

---

[1] Father is not a party to this appeal.

given the opportunity for supervised visits with M in 2023, but was inconsistent in attending. Ultimately, the visits were structured so that M would only be brought to the location if and when mother showed up. Mother's inappropriate behaviors at visitation scared M and caused M anxiety. At a visit on August 14, 2023, M became scared and wanted to stop the visit but was encouraged to continue. Just before the next scheduled visit on August 28, 2023, although she had been transported for the visit, M was very upset and said that she was scared and that she did not want to have a visit, so the visit did not occur. Thereafter, M was offered visits but showed signs of anxiety and distress at being asked, and she declined visits.

Mother went for an intake appointment for mental health therapy in January 2024 and attended one appointment after the intake but then did not go back. The therapist she saw was out of the office beginning in March, and although mother was offered a different therapist, she declined to see someone else. The ODHS caseworker encouraged her to see a different therapist and not wait.

After numerous reminders and two failed attempts, mother completed a psychological evaluation with Dr .Cook in January 2024. Cook concluded that mother has borderline personality disorder, posttraumatic stress disorder, persistent depressive disorder, and generalized anxiety disorder. He stated in his report that "[h]istorical records, test results, and clinical impressions paint a consistent picture of an individual in severe psychiatric disarray" and described mother as "a traumatized, depressed, fearful, and unstable individual who will have significant difficulty maintaining stability within her own life, let alone when pressed into service to care for 2 young children."[2] Cook recommended that mother "earnestly engage in psychiatric services including psychotherapy and presumably medications" and strongly recommended Dialectical Behavior Therapy (DBT), which is "designed for individuals much like [mother] with significant personality dysfunction, psychiatric illness, and trauma histories."

---

[2] M has a half-sibling who is not involved in this appeal.

In April 2024, mother met with Ashley Castro, the ODHS permanency worker, to review Cook's report, go over her action agreements with her, and to request that mother sign releases of information for services she wanted to participate in. Mother declined the offered services, stating that she did not have a problem and did not need services. Castro gave mother a list of DBT facilities and phone numbers, because of Cook's recommendation for that kind of therapy, and asked if mother wanted to start contacting them with Castro and mother's case manager; mother declined help to make those calls. Mother eventually began DBT therapy in July 2024.

On June 5, 2024, the juvenile court held a permanency review hearing. The court found that ODHS had made reasonable efforts to reunify the family; however, mother had not made sufficient progress toward meeting the expectations set for her, and M could not be safely returned to mother's care. At that time, the permanent plan was changed from reunification to adoption.

ODHS filed a petition on July 5, 2024, to terminate mother's parental rights to M. ODHS alleged that mother's rights

"should be terminated under ORS 419B.504 on the grounds that the mother is unfit by reason of conduct or condition seriously detrimental to the child and integration of the child into the mother's home is improbable within a reasonable time due to conduct or conditions not likely to change, including, but not limited to the following:

"a)   Physical and/or emotional neglect of the child.

"b)   Lack of effort to adjust the parent's circumstances, conduct or conditions to make return of the child to the parent possible within a reasonable time.

"c)   Failure to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"d)   A mental health condition of [mother] of such nature and duration as to render [mother] incapable of providing proper care for the child for extended periods of time.

"e)   Lack of effort or failure to obtain and maintain a suitable or stable living situation for the child so that return of the child to the parent is possible.

"f)   Failure to present a viable plan for the return of the child to [mother's] care and custody.

"g)   Failure to learn or assume parenting skills sufficient to provide a safe and stable home for the raising of the child."

The termination of parental rights (TPR) trial took place over four days in November 2024.

Mother testified at the TPR trial. She stated that she has had depression since she was 13 years old and used to take medication but did not like being medicated. She acknowledged that Cook diagnosed her with borderline personality disorder but stated that she did not "think that I'm like that really anymore." Early in her testimony—she was the first witness—she asked, "Can I just go home?" at which point the court took a recess for mother to confer with her attorney. Ultimately mother continued on with her testimony.

Gabriel Benfield, an outpatient therapist at Yamhill County Adult Behavioral Health, testified about the DBT training he provides and mother's involvement with that program. Benfield began working with mother in July 2024, as an individual therapist; mother participated in virtual group sessions led by another therapist in the office. Although mother attended many of the group sessions, she was often withdrawn and distracted or disruptive. By the time of the TPR trial, Benefield had met with mother individually four times—once for screening and three times for therapy. Benfield had seen some improvements, but testified that mother had not done her homework, and he would not expect to see as much improvement in mother as someone who does the homework. The first round of DBT modules was scheduled to end in January 2025; if mother did a second round, which is when the treatment "really starts to click" for some people, that would go through approximately July 2025. At one group session, mother had expressed that she was just "looking forward to this being done so I can see my kids again." Benfield helped mother draft a clarification

letter—from mother to M[3]—at the suggestion of ODHS in order for visits to begin again, and, in October 2024, he attempted to contact M's therapist in an effort to coordinate a meeting between mother and M; he learned that M's therapist had closed her case in February or March of 2024.

M was evaluated by a psychologist, Soobin Im, at the Children's Program in May 2024. M's cognitive assessment showed that she is "performing at a very superior level" and has an exceptionally high IQ score. M had an "at-risk" anxiety score. Stressors for M included the lack of permanency and the possibility of returning to her mother's care; M "was displaying intrusive memories and avoidance around early life stressors, including having nightmares at times, not wanting to talk about what happened to her, refusing to go to places that remind her of upsetting events, which also included visits." M told Im that she did not want to see her biological mother again because her mother is mean to her. Im stated,

> "Overall, she presented as a child who are—who is very smart, cognitively intelligent. She seemed to be experiencing some mood problems, particularly anxiety, and I provided the diagnosis of adjustment disorder with anxiety due to those concerns, anxiety around the visits with the mom as well as the lack of permanency."

Im anticipated that M's "overall adjustment and functioning would decline" if she would be "reunified with her biological parent unless significant therapeutic supports" were provided and those needed supports would be for both mother and M. When asked whether it is in M's best interests to strongly encourage contact with her mother, Im explained that that "could be potentially distressing" to M. M is bonded with her resource parents and wished to continue living with them. M's adjustment issues are centered around the lack of permanency and M needs permanency as soon as possible more than another child in foster care might. One source of anxiety for M is the uncertainty about who she is going to be living with in the long term. Im stated that even though M is young, her voice should be considered,

---

[3] As we explain below, M's therapist testified that she sometimes recommends that a parent write a letter to the child in which they take ownership for how their choices and behaviors have impacted the child.

as that is important for her development—the narrative she develops as she matures and the ability to have control over things in her life.

According to Im, M needs a caregiver who can understand the effects of early trauma on her development and who can provide a structured and predictable environment for her to feel safe and secure. M's bond with her mother appears to be limited. Im agreed that, if M were to be reunited with a biological parent, "her capacity of reattaching to another primary attachment figure would hinge largely on the skills and abilities of the subsequent caregiver and willingness to participate in services and follow recommendations to strengthen that caregiver-child attachment." Im also agreed, when asked, that if mother had identified mental health issues and had inconsistent attendance at therapy, that would not indicate a willingness to participate in services and follow recommendations to strengthen the bond with her child. The core stressor for M—the thing holding her back—is the lack of permanency. In Im's opinion, permanency with a long-term caregiver would outweigh having the ability to maintain contact with her extended biological family members.

Michelle Crawley-Withee provided Parent-Child Interaction Therapy (PCIT) for M and her resource parents. Crawley-Withee testified that that therapy was trauma-focused due to the background information that had been provided with the referral. The therapy sessions were weekly from approximately April or May 2023 through February 2024. In PCIT, the therapist teaches the caregivers skills and coaches them to use those skills along with homework to practice in between sessions. Consistency is very important, and the resource parents here picked up the skills quickly and practiced—they were very consistent and always did their homework. Crawley-Withee explained that children who come from environments where things were unstable or chaotic have a lot of anxiety about whether the parent is going to consistently be there for them; the consistency helps the child feel safe and secure and experience the love and care that is needed for attachment and development.

After learning of M's distress about visits with mother, Crawley-Withee discussed with ODHS the possibility of pausing visits temporarily while mother could get more stable and be more appropriate in visits while also continuing to work with M so that she might be more comfortable with visits, and also discussed just telling M that if she wanted to have a visit she could ask for one at any time.

Crawley-Withee also discussed with the ODHS worker a "clarification process," which is something she sometimes recommends when there has been a disruption in a relationship and a child is expressing fear of a parent, but the hope is for reunification. In that process, the parent, who must have their own therapist to help them work through it, essentially writes a letter where they are taking ownership for how their choices and behaviors have impacted the child. It is a back-and-forth process where the child is ready to hear the information and the parent is in a place where they have done their own healing, and it is meant to lead to healing and reunification. Crawley-Withee did not receive any clarification letter prior to ending M's treatment in February 2024. However, she did receive a message from mother's therapist in October 2024—approximately a month before the TPR trial—saying that they had a letter they wanted to get to M. But Crawley-Withee was no longer working with M and could not assist, and left a message that they should follow up with the ODHS caseworker. In Crawley-Withee's view, mother would have needed to engage in her own therapy as a necessary element before any successful engagement with M and from the information she had while working with M, mother had not done that. At the time Crawley-Withee closed M's services, M was not showing any clinically significant behaviors that would qualify her for treatment and there was no medical necessity for M to have ongoing individual therapy. However, if mother started therapy and worked on a clarification letter, it could be a trigger to start the process of getting M back into therapy.

The juvenile court determined that mother was unfit as alleged in that mother has a mental health condition that is seriously detrimental to the child. However, the court concluded that ODHS had not met its burden to prove

that "the integration of the child into the home of the parent is improbable within a reasonable time due to the conduct or conditions not likely to change." The court stated, "so that's the one that I had, I did, couldn't, I couldn't get there, I just had too many issues with some of the things that I think could have helped that weren't offered." The court explained that, in its view, "there was a lack of reasonable efforts to maintain that child's contact, it was just was completely cut off" and that "[m]other's not been allowed to work with the child in therapy since she was not allowed parenting time or contact with the child due to these prerequisite conditions imposed, such as CBT, an approved clarification letter, not offered reunification counseling, [and] put in a DBT class that really wasn't the right class for her." The court did not decide whether it was in M's best interests for mother's parental rights to be terminated—a finding it would need to make under ORS 419B.500 only if it had first determined that mother was unfit under ORS 419B.504.

The juvenile court issued a letter opinion dated March 29, 2025, that was consistent with its oral ruling. As it relates to ODHS failing to meet its burden of proof, the court focused on the lack of contact between mother and M and the "additional conditions that were added to mother before she would be eligible to even pursue visits." The court issued a judgment on April 23, 2025, dismissing the TPR petition as to mother. The language in the judgment is consistent with the findings and conclusions the court previously expressed. It states:

> "The court finds that the mother has engaged in conduct and is characterized by mental health conditions. The court finds that the conduct or condition is seriously detrimental to the child. However, the court cannot find that the petitioner has met the burden of proof by clear and convincing evidence that integration of the child into the mother's home is improbable within a reasonable period of time due to conduct or conditions not likely to change. The court cannot find by clear and convincing evidence that the mother has failed to effect a lasting adjustment after reasonable efforts by social service agencies for such extended duration of time that it appears reasonable no lasting adjustment can be effected."

M timely appealed.

On appeal, M urges us, on *de novo* review, to find to the contrary under the applicable clear and convincing evidence standard that mother is unfit within the meaning of ORS 419B.504. In response, ODHS urges us to do the same. As we explain, having reviewed the evidence *de novo*, we are persuaded by clear and convincing evidence that mother is unfit by reason of conduct or condition that is seriously detrimental to M and that integration of M into mother's home is improbable within a reasonable time. We therefore reverse and remand for the juvenile court to consider in the first instance whether termination is in M's best interest. Although we have the authority to make that determination ourselves on *de novo* review notwithstanding the fact that the juvenile court did not reach the question, because the best interest determination may rest on demeanor-based observations to some degree, we think the better course is to remand.

ORS 419B.504 states, as pertinent:

"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions:

"(1)   The court shall consider but is not limited to the following:

"* * * * *

"(c)   Physical neglect of the child or ward.

"(d)   Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.

"* * * * *

"(f)   A mental health condition of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time."

That statute requires a court to decide, first, "whether the parent is unfit—that is, whether the parent has engaged in conduct or is characterized by a condition and whether the conduct or condition is seriously detrimental to the child" and, second, "whether, given the parent's conduct or condition, it is improbable that the child may be integrated into the parent's home within a reasonable time." *Dept. of Human Services v. D. M. T.*, 239 Or App 127, 137, 243 P3d 836 (2010), *rev den*, 349 Or 654 (2011).

A "reasonable time" is defined as "a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(27). The Supreme Court explained that the reasonable time question is child-specific and "calls for testimony in psychological and developmental terms regarding the particular child's requirements." *State ex rel SOSCF v. Stillman*, 333 Or 135, 146, 36 P3d 490 (2001). In addition,

"the focus of both parts of the test for termination under ORS 419B.504 is on the detrimental effect of the parent's conduct or condition on the child, not just the seriousness of the parent's conduct or condition in the abstract. Thus, the court first must identify the parent's conduct or condition, and then measure the degree to which that conduct or condition has had a seriously detrimental effect on the child."

*Id.*

If the grounds for termination are met, then the court must decide whether termination is in the child's best interest. *D. M. T.*, 239 Or App at 137; ORS 419B.500. Under ORS 419B.521(1), the factual basis for termination must be established by clear and convincing evidence.

There is no dispute that mother is unfit under the first part of the test. The juvenile court found that "mother has engaged in conduct and is characterized by mental health conditions" and "the conduct is seriously detrimental

to the child." Having reviewed the record, we agree with that finding.

The issue on appeal pertains to the second part of the test. Having reviewed the record, we find by clear and convincing evidence that mother's mental health conditions, as alleged in paragraph 6d of the TPR petition, have prevented and will continue to prevent her from providing proper care for M for a prolonged period of time and that there has been a lack of effort by mother to adjust her circumstances, conduct or conditions to make return of the child possible within a reasonable time.[4]

The juvenile court here focused on what it found was a lack of services (reasonable efforts by available social agencies) to enable visits and effectuate the potential reunification between mother and M. As we explained in *D. M. T.*, ODHS "is required to make reasonable efforts during dependency proceedings"; however, the issue at the termination stage of the case is

> "whether 'integration of the child or ward into the home of the parent or parents *is* improbable within a reasonable time due to conduct or conditions not likely to change.' ORS 419B.504 (emphasis added). The legislature's use of the present tense requires the court to decide the improbability of integration due to conduct or conditions not likely to change *at the time of the termination hearing*, not to decide whether the parent's conduct or condition might have been susceptible to change at some point in the past."

239 Or App at 140 (emphases in *D. M. T.*). We also acknowledged that, in some cases, ODHS's failure to make reasonable efforts might be relevant to the determination regarding

---

[4] Here, the juvenile court explicitly found that ODHS did not prove that mother was unfit under allegation 6c of the TPR petition. ODHS asserts that, if a petition contains multiple allegations, proof of any one allegation is sufficient to terminate parental rights. *See State ex rel Dept. of Human Services v. Simmons*, 342 Or 76, 95, 149 P3d 1124 (2006) (under ORS 419B.500, parental rights may be terminated if ODHS "establishes the existence of one or more statutory grounds for termination of parental rights by clear and convincing evidence"); *State ex rel Dept. of Human Services v. D. F. W.*, 225 Or App 220, 234, 201 P3d 226 (2009) (focusing on specific allegations in TPR petition and assuming "that proof of any of those allegations would provide grounds for termination"). As a result, the finding that there was a failure of proof as to one allegation, in and of itself does not warrant dismissal of the petition when there are other statutory grounds for termination that were proven, as is the case here.

integration—for example, if the condition that prevented the children's integration into the parent's home could be ameliorated within a reasonable time if ODHS had provided a referral but failed to do so. *Id.* at 140-41.

Here, the condition that is preventing the integration of M into mother's home is mother's mental health issues, and any delay in mother accessing services or making improvements was not caused by the failure of ODHS to act. In addition, mother's inappropriate behavior at the visits with M is directly tied to her lack of insight and lack of engagement in mental health treatment. Mother was ordered to have a mental health assessment and psychological evaluation in May 2023. She refused to engage in services or work with ODHS in any meaningful way until finally participating in psychological evaluation in January 2024. That evaluation revealed that mother has multiple mental health diagnoses: borderline personality disorder, posttraumatic stress disorder, persistent depressive disorder, and generalized anxiety disorder. And as noted above, Cook emphasized the serious nature of those diagnoses when he described mother as "a traumatized, depressed, fearful, and unstable individual who will have significant difficulty maintaining stability within her own life, let alone when pressed into service to care for 2 young children."

The evidence is clear and convincing that mother's circumstances, conduct, or conditions make integration of M into mother's home improbable within a reasonable time. Mother has been resistant to working with ODHS throughout its involvement with this family and at times she refused services because she did not believe she needed them. After finally beginning to engage in the recommended DBT treatment in July 2024, mother was distracted, withdrawn, or disruptive in the group sessions and failed to do her homework, indicating that she just wanted to get treatment done so that she could see her children. At the time of the trial in November 2024, mother had not yet even completed one round of DBT modules, which were scheduled to end in January 2025, and mother had been minimally engaged in the sessions that she had attended. Although mother's therapist could not say that mother would need to do a second round of DBT modules, he

indicated that for some people, that is when things would click. And he agreed that someone who was in therapy just to jump through ODHS's hoops to get her daughter back would not have the level of commitment that he would hope for. In addition, it is evident that mother continued to lack insight into the seriousness of her condition given her testimony at trial that, although Cook had diagnosed her with borderline personality disorder, she was not really like that anymore. Given mother's lack of insight and lack of engagement with mental health treatment, she is unlikely to make significant progress in the near future.

As explained above, the test for whether integration of the child into the parent's home within a reasonable time is improbable is a child-specific inquiry and is focused on the particular psychological and developmental requirements of the child. Both M's therapist and the psychologist who evaluated M emphasized that M needs permanency and consistency from her caregivers. Im explained that M needs a caregiver who can provide a structured and predictable environment to allow her to feel safe and secure. M's adjustment issues are centered around the lack of permanency and M needs permanency as soon as possible, more than another child in foster care might. M has suffered from anxiety that was related to seeing her mother or even the thought of seeing her mother, and M's therapist noted that mother would need to be engaged in her own therapy—in part to become more stable and be more appropriate in visits—before any attempts at reunification. Given M's immediate need for permanency and mother's lack of meaningful engagement in mental health therapy and lack of insight into her own mental health condition and M's needs, we find that integration of M into mother's home is improbable within a reasonable time.

The juvenile court stated in its opinion letter dated March 29, 2025, that "[i]f the court was required to make a best interest finding first, then the decision may be different." As we stated above, although on *de novo* review we could reach the final part of the test and consider whether termination is in M's best interests, we instead remand for the juvenile court to make that determination in the first instance.

Reversed and remanded.